[Cite as *State v. Mauldin*, 2010-Ohio-4192.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | CASE NO. 08-MA-92 |
| | ) | |
| DONTE MAULDIN, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Court of Common
                              Pleas of Mahoning County, Ohio
                              Case No. 08CR181

JUDGMENT:                     Affirmed in part
                              Reversed and remanded in part


APPEARANCES:
For Plaintiff-Appellee        Paul Gains
                              Prosecutor
                              Ralph M. Rivera
                              Assistant Prosecutor
                              21 W. Boardman St., 6th Floor
                              Youngstown, Ohio 44503-1426


For Defendant-Appellant       Attorney Mark I. Verkhlin
                              839 Southwestern Run
                              Youngstown, Ohio 44514

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite


                                          Dated: September 1, 2010
DONOFRIO, J.

{¶1} Defendant-appellant, Donte Mauldin, appeals from a Mahoning County Common Pleas Court judgment convicting him of felony domestic violence following a jury trial and the resulting sentence.

{¶2} On February 1, 2008, Officers Francis Bigowsky and Joe Moran responded to a call regarding a domestic disturbance at 1630 Butler Avenue in Youngstown. Dana Armstrong answered the door. The officers observed that Armstrong was visibly shaken and that she had cuts and bruises on the left side of her face and head and a cut on her nose. After first stating that no one else was home with her, Armstrong told the officers that "he" was upstairs. "He" was appellant. Armstrong also told the officers that appellant, her live-in boyfriend, had punched her. The officers called for appellant to come downstairs and, after a minute, he complied. The officers arrested appellant.

{¶3} After arresting appellant, the officers went upstairs. They noticed appellant's clothing. They also observed a broken bathroom mirror.

{¶4} On March 6, 2008, a Mahoning County grand jury indicted appellant on one count of domestic violence, a third-degree felony in violation of R.C. 2919.25(A)(D). The charge was a third-degree felony because appellant had two prior convictions for domestic violence.

{¶5} The matter proceeded to a jury trial. The jury found appellant guilty as charged. The trial court subsequently sentenced appellant to three years in prison.

{¶6} Appellant filed a timely notice of appeal on May 9, 2008.

{¶7} Appellant raises four assignments of error. His first two assignments of error share a common basis in fact. Therefore, we will address them together. They state, respectively:

{¶8} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED DEFENDANT-APPELLANT, DONTE MAULDIN'S CRIM.R. 29 MOTION TO DISMISS SINCE THE STATE HAD NOT MET ITS BURDEN OF SHOWING ALL OF THE ELEMENTS OF THE OFFENSE BEYOND A

REASONABLE DOUBT AND THE EVIDENCE WAS INSUFFICIENT TO SHOW A FINDING OF GUILT BEYOND A REASONABLE DOUBT."

**{¶9}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, AFTER A JURY TRIAL, IT FOUND DEFENDANT-APPELLANT, DONTE MAULDIN GUILTY OF DOMESTIC VIOLENCE IN VIOLATION OF R.C. 2919.25(A)(1) AND (D)(4) BEYOND A REASONABLE DOUBT, WHEN SUCH A CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶10}** Appellant first argues that plaintiff-appellee, the State of Ohio, failed to prove each element of domestic violence. Consequently, he argues that the trial court should have granted his Crim.R. 29 motion for acquittal. Specifically, appellant contends that the state failed to prove that he cohabited with Armstrong and thus, failed to establish that Armstrong was a "family or household member." He asserts that although he had clothing at Armstrong's home and spent time there these facts did not establish his intent to permanently reside there. Appellant points out that there was no testimony that he and Armstrong shared family or financial responsibilities. And appellant points out that even Armstrong did not testify that he resided with her.

**{¶11}** An appellate court reviews a denial of a motion to acquit under Crim.R. 29 using the same standard it uses to review a sufficiency of the evidence claim. *State v. Rhodes,* 7th Dist. No. 99-BA-62, 2002-Ohio-1572, at ¶9; *State v. Carter* (1995), 72 Ohio St.3d 545, 553.

**{¶12}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict. *State v. Smith* (1997), 80 Ohio St.3d 89, 113. In essence, sufficiency is a test of adequacy. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith,* 80 Ohio St.3d at 113.

{¶13} The jury convicted appellant of domestic violence in violation of 2919.25(A), which provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Physical harm means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶14} The domestic violence statute defines a "family or household member" as:

{¶15} "(a) Any of the following who is residing or has resided with the offender:

{¶16} "(i) A spouse, a person living as a spouse, or a former spouse of the offender;

{¶17} "(ii) A parent or a child of the offender, or another person related by consanguinity or affinity to the offender;

{¶18} "(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender." R.C. 2919.25(F)(1)(a).

{¶19} The statute goes on to define "person living as a spouse" as "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2). In this case, the state alleged that appellant was cohabiting with Armstrong.

{¶20} In addition to these elements, the state had to prove that appellant had been convicted of two or more offenses of domestic violence in order to raise this offense to a third-degree felony. See R.C. 2919.25(D)(4).

{¶21} We must examine the state's evidence to determine whether it was sufficient to support appellant's conviction.

{¶22} Officer Bigowsky was the first to testify. Officer Bigowsky stated that he and Officer Moran responded to a call regarding a domestic disturbance at Armstrong's home. (Tr. 149-50). When he knocked on the door, Armstrong answered. (Tr. 150). Officer Bigowsky stated that Armstrong was visibly shaken, appeared to be in shock, and stuttered when she spoke. (Tr. 150). He noticed that she had cuts and bruises on the left side of her face, a cut on her nose, and a large lump on the left side of her head as if she had just been struck. (Tr. 150-51). The officers asked Armstrong what happened and heard commotion upstairs. (Tr. 151). Armstrong told the officers, "He's upstairs. I'm scared." (Tr. 152). Officer Bigowsky stated that Armstrong was referring to appellant, her boyfriend. (Tr. 152). He testified that Armstrong told them that appellant punched her five or six times in the head and pulled her hair, ripping out a wig. (Tr. 153).

{¶23} Next, Officer Bigowsky stated that he called for appellant to come downstairs and, after a minute or two, appellant complied. (Tr. 153-4). The officers handcuffed appellant and asked him what happened. (Tr. 155). Appellant told them that he and Armstrong got into a verbal argument, but it was not physical. (Tr. 155).

{¶24} Additionally, Officer Bigowsky testified that throughout the house, he observed appellant's clothing. (Tr. 156). He testified that appellant lived at that residence with Armstrong. (Tr. 156). He based this conclusion on seeing appellant's clothing and also because he had been at Armstrong's house a few other times in the past month and appellant was there then too. (Tr. 156-57). Officer Bigowsky also testified that Armstrong had indicated that her "live-in" boyfriend beat her up. (Tr. 162). And he testified that Armstrong told him that she believed she was pregnant by appellant at the time. (Tr. 164).

**{¶25}** Officer Bigowsky admitted, however, on cross examination that the address he listed for appellant was on Philadelphia Avenue. (Tr. 166). He stated that this was appellant's mother's address, which was on appellant's driver's license. (Tr. 177).

**{¶26}** Officer Moran testified next. Officer Moran stated that he responded to a call about a fight between a male and a female. (Tr. 184). Armstrong told the officers that she had been struck several times in the head and face by appellant, her live-in boyfriend, with his closed fist. (Tr. 186-87). Upon Armstrong's indication that "he" was upstairs, Officer Moran testified that they called for appellant to come down, which he eventually did. (Tr. 187).

**{¶27}** Detective Brian Flynn was the last witness to testify for the state. He identified certified judgment entries from appellant's two prior domestic violence convictions, which were entered into evidence. (Tr. 203-204; State's Exs. 8 and 9).

**{¶28}** The only element appellant asserts was not supported by sufficient evidence is that he was Armstrong's "family or household member." Thus, he impliedly concedes that the other elements were supported by sufficient evidence. However, we will briefly address the other elements first.

**{¶29}** The evidence demonstrated, by way of Officers Bigowsky's and Moran's testimony, that appellant knowingly punched Armstrong in the head and that she had visible, physical injuries. Additionally, Officer Flynn's testimony and State's Exhibits 8 and 9 proved appellant's two prior domestic violence convictions.

**{¶30}** Appellant argues that the state did not demonstrate that he was a family or household member of Armstrong because he did not have the intent to permanently reside with her. The Ohio Supreme Court has declined to adopt a narrow definition of "family or household member" that limits the relationship to those who actually share one residential address. *State v. Williams* (1997), 79 Ohio St.3d 459, 462. That is because the offense of domestic violence arises out of the parties' relationship, not their exact living circumstances. Id. at paragraph one of the syllabus.

**{¶31}** Instead, the Court has held that "cohabitation" is comprised of two essential elements: (1) sharing of familial or financial responsibilities and (2) consortium. *Williams,* 79 Ohio St.3d at paragraph two of the syllabus. Some factors that can demonstrate the sharing of familial or financial responsibilities include: provisions for shelter, food, clothing, utilities, and/or commingled assets. Id. at 465. Some factors that may establish consortium include: mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. Id. "These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact." Id. The burden of establishing cohabitation is not substantial. *Youngstown v. Dixon*, 7th Dist. No. 07-MA-105, 2009-Ohio-1013, at ¶18, citing *State v. Woulard,* 158 Ohio App.3d 31, 2004-Ohio-3395, at ¶73.

**{¶32}** Here, the evidence is sufficient to support a finding of cohabitation, and thus, a finding that appellant was Armstrong's "family or household member."

**{¶33}** The evidence, when viewed in a light most favorable to the state, demonstrated (1) appellant's clothes were located throughout Armstrong's house; (2) Officer Bigowsky had been at Armstrong's house several times during the past month and appellant was always there; (3) Armstrong referred to appellant as her "live-in" boyfriend; and (4) Armstrong believed that she was pregnant and that appellant was the father.

**{¶34}** Other courts have found sufficient evidence of cohabitation based on even less evidence. See *State v. Collins*, 5th Dist. No. 2002AP090069, 2003-Ohio-4854 (only evidence of cohabitation was victims' testimony that appellant lived with them); *City of Lakewood v. Reese* (March 20, 1997), 8th Dist. No. 70193 (testimony by two officers that victim told them that her "live-in" boyfriend assaulted her was sufficient to establish that defendant caused physical harm to "family or household member" within meaning of city ordinance). And the fact that Armstrong believed she was pregnant at the time and appellant was the father demonstrated that she and appellant had a sexual relationship. See *Williams*, 79 Ohio St.3d 459 (testimony that

at one time victim thought she might be pregnant with defendant's child was evidence of conjugal relations and helped to prove consortium).

**{¶35}** Appellant argues that this court's decision in *State v. Alvey*, 7th Dist. No. 03-BE-24, 2003-Ohio-7006, necessitates a finding that he did not cohabitate with Armstrong. However, a reading of *Alvey* reveals that such is not the case. Alvey was convicted of domestic violence against his niece. We reversed his conviction on appeal based on insufficient evidence. In so doing, we held that residency is a requirement that must be proven to sustain a domestic violence conviction and is not found merely because the parties are related by consanguinity. Id. at ¶23. We further held that the determination of whether the parties reside together is based on their particular living circumstances. Id. We then went on to explain that in this situation, we were not addressing whether two people were "living as spouses", and therefore, a finding of cohabitation was not necessary. Id. at ¶25. We found that in Alvey's case, shared meals and frequenting each other's house was not enough to constitute "residing" together. Id.

**{¶36}** *Alvey* did not address the issue we are faced with in this case, that being whether the evidence sufficiently supports a finding of cohabitation as to persons living as spouses. Additionally, as discussed above, the evidence in this case demonstrates much more than simply sharing meals and visiting each other's houses, as was the case in *Alvey*. Thus, contrary to appellant's assertion, *Alvey* does not dictate a finding that appellant did not cohabitate with Armstrong.

**{¶37}** Based on the above, the state presented sufficient evidence that appellant was a "family or household member" of Armstrong.

**{¶38}** Appellant next argues that the jury's verdict was against the manifest weight of the evidence. He first contends that the weight of the evidence did not support a finding that he acted knowingly. He points to Armstrong's testimony in support. Second, appellant asserts that the weight of the evidence did not support a finding that he and Armstrong were family or household members. He makes the same argument in support here as previously discussed.

{¶39} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.

{¶40} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.

{¶41} In addition to the state's evidence, we must also consider appellant's evidence when determining whether his conviction was against the manifest weight of the evidence.

{¶42} Appellant called Armstrong in his defense. Armstrong testified that she rents her house. (Tr. 224). On her rental application, she listed two people residing at her house, her and her son. (Tr. 225). She testified that appellant does not currently reside with her. (Tr. 225). She further testified:

{¶43} "Q     February 1st, the day of the incident.

{¶44} "A     Yes.

{¶45} "Q     Was he [appellant] residing at your house?

{¶46} "* * *

{¶47} "A     Yes, he was there.

{¶48} "Q     Okay. Let me rephrase. He was there that day; correct?

{¶49} "A     Uh-huh.

{¶50} "Q     Was he living with you?

{¶51} "A     Well, he was there a lot.

**{¶52}** "Q     He was there a lot?

**{¶53}** "A     Yes.

**{¶54}** "Q     How often was he there?

**{¶55}** "A     About every day." (Tr. 226)

**{¶56}** Armstrong further testified that appellant had been her boyfriend for approximately four months leading up to the day in question. (Tr. 227). She stated that when appellant was not at her house, he resided with his mother on Philadelphia Avenue. (Tr. 227-28). Armstrong stated that when she spoke with the prosecutor she told him that appellant's belongings were at her house and he had a key to her house but that he also stayed at his mother's house. (Tr. 232). She also testified that, when talking to police, she referred to appellant as her "live-in" boyfriend. (Tr. 251). And she stated she and appellant spent every day together, the majority of the time when she came home she would find appellant sleeping on the couch, they bought food for each other, and they had sexual relations. (Tr. 251-52).

**{¶57}** Armstrong also testified about the fight. She stated that she and appellant started arguing about a text message he received from another woman. (Tr. 235). She testified that appellant punched her in the face. (Tr. 248). Armstrong testified that she was scared and she wanted appellant to stay away from her so she struck the bathroom mirror with her fist and broke it. (Tr. 236-37). And Armstrong stated that the reasons she hit the mirror was in an attempt to stop appellant from hitting her. (Tr. 250).

**{¶58}** Armstrong further testified regarding a letter she wrote to appellant while he was in jail. In the letter, Armstrong expressed to appellant that she told the police he had hit her but she had lied. (Tr. 243, Def. Ex. 1). However, on cross examination, Armstrong stated that she did not want appellant to know that she told the police what had happened. (Tr. 247).

**{¶59}** Armstrong's testimony lends further support to the fact that appellant cohabited with her. Although she did not come out and say that appellant absolutely resided with her, her testimony went to several of the factors that demonstrate

cohabitation. She stated that appellant had been her boyfriend for four months, appellant had a key to her house, appellant's belongings were at her house, appellant was sleeping at her house when she came home most of the time, they bought food for each other, they spent every day together, and they had sexual relations. Appellant did testify that appellant did not currently reside with her. However, appellant's residence at the time of the assault was what mattered, not his residence at the time of trial. Additionally, Armstrong's testimony further supported the officers' testimony that appellant punched her in the face.

**{¶60}** Consequently, the jury did not lose their way in finding appellant guilty of domestic violence.

**{¶61}** Accordingly, appellant's first and second assignments of error are without merit.

**{¶62}** Appellant's third assignment of error states:

**{¶63}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED OFFICER FRANCIS BIGOWSKY TO TESTIFY AS TO WHAT DANA ARMSTRONG STATED OCCURRED IN THE RESIDENCE AT 1630 BUTLER AVENUE, OVER OBJECTION, AS SUCH TESTIMONY IS HEARSAY AND INADMISSIBLE PURSUANT TO EVID.R. 801(C)."

**{¶64}** Here appellant argues that the trial court erred in allowing Officers Bigowsky and Moran to testify regarding what Armstrong told them when they arrived at her apartment. He cites to two instances where he objected to this testimony, but was overruled by the court. (Tr. 153, 185-87). Both officers testified that Armstrong told them that appellant punched her. Appellant argues that their testimony was inadmissible hearsay. He further argues that the excited utterance exception to the hearsay rule did not apply because Armstrong was not under the stress of the event when she spoke to the officers and the alleged event had occurred sometime before the officers arrived.

{¶65} Hearsay is an out-of-court statement, offered in court, to prove the truth of the matter asserted. Evid.R. 801(C). Generally, hearsay is inadmissible. Evid.R. 802. However, there are numerous exceptions to the hearsay rule.

{¶66} One of those exceptions is for "excited utterances." An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). In order for an excited utterance to be admissible, four requirements must be met: (1) there must be a startling event that produces nervous excitement in the declarant so that his statement is spontaneous and non-reflective; (2) the declarant must make the statement while he or she is still under the stress of the excitement; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. *State v. Taylor* (1993), 66 Ohio St.3d 295, 300-301, citing *Potter v. Baker*, 162 Ohio St. 488, at paragraph two of the syllabus.

{¶67} The parties spend some time discussing the proper standard of review to apply here. This court reiterated the standard of review when examining whether a trial court properly admitted a hearsay statement under the excited utterance exception in *State v. Perdue* (Dec. 30, 1993), 7th Dist. No. 90 C.A. 18:

{¶68} "We begin with a discussion of the standard of review for this type of issue. In *State v. Boston* (1989), 46 Ohio St.3d 108, 117, the Supreme Court of Ohio quoted *Potter v. Baker* (1955), 162 Ohio St. 488, at 500:

{¶69} "' * * * [W]e believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule [excited utterance], should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision. * * * '"

{¶70} Thus, an abuse of discretion standard of review applies. See also *State v. Bozarth*, 5th Dist. No. 08-CA-008, 2009-Ohio-2013, at ¶30; *City of Columbus v. Bishop*, 10th Dist. No. 08AP-300, 2009-Ohio-6964, at ¶12; *State v. Hunneman*, 12th

Dist. No. CA2006-01-006, 2006-Ohio-7023, at ¶26; *Roach v. Roach* (1992), 79 Ohio App.3d 194, 205.

**{¶71}** The excited utterance exception to the hearsay rule is often used to admit statements of domestic violence victims. *State v. Ducey*, 10th Dist. No. 03AP-944, 2004-Ohio-3833, at ¶20.

**{¶72}** To determine whether the trial court abused its discretion in admitting the officers' testimony as to Armstrong's statements we must examine the statements in light of the above-cited requirements.

**{¶73}** First, there must have been a startling event that produced nervous excitement in Armstrong so that her statements were spontaneous. Here, the startling event for Armstrong was being punched five to six times in the head by her boyfriend. An assault is a startling event. *State v. Fields*, 8th Dist. No. 88916, 2007-Ohio-5060, at ¶53; *State v. Grey*, 10th Dist. No. 06AP-15, 2007-Ohio-1504, at ¶11.

**{¶74}** Second, Armstrong must have made the statements while still under the stress of the excitement. The officers' testimony demonstrated that Armstrong was still under the stress of her assault. Officer Bigowsky testified that when Armstrong opened the door he observed that she was physically shaking, she stuttered when she spoke, and she appeared to be in a state of shock. (Tr. 152-53). Officer Bigowsky also testified that Armstrong stated, "He's upstairs. I'm scared." (Tr. 152). He further testified appellant had cuts and bruises on her face and a large lump on the side of her head as if she had just been struck. (Tr. 150-51). And Officer Moran testified that Armstrong was shaking and appeared scared. (Tr. 186). Officer Moran also stated that Armstrong made her statements to them a minute after they arrived. (Tr. 186). Given the officers' observations of Armstrong's demeanor and their timing, it was reasonable for the trial court to conclude that she was still under the excitement of the assault when she made her statements to the officers.

**{¶75}** Third, the statements must have related to the startling event. Armstrong's statements were that appellant punched her in the head five or six times. (Tr. 153, 186). These statements related to the assault.

**{¶76}** Fourth, Armstrong must have personally observed the startling event. Clearly, Armstrong observed the event of appellant punching her.

**{¶77}** Because all of the requirements for an excited utterance were present, we cannot conclude that the trial court abused its discretion in admitting Armstrong's statements under this hearsay exception.

**{¶78}** Accordingly, appellant's third assignment of error is without merit.

**{¶79}** Appellant's fourth assignment of error states:

**{¶80}** "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT INCORRECTLY ADVISED DEFENDANT-APPELLANT, DONTE MAULDIN THAT IT WOULD RECOMMEND THAT HE WOULD BE SUBJECT TO A PERIOD OF THREE YEARS OF POST RELEASE CONTROL, WHEN THE CORRECT PERIOD OF POST RELEASE CONTROL IS THREE YEARS FOR A FELONY OF THE THIRD DEGREE WHERE THE OFFENDER CAUSES OR ATTEMPTS TO CAUSE PHYSICAL HARM TO THE VICTIM PURSUANT TO R.C. 2967.28(B)(3), RENDERING APPELLANT'S SENTENCE VOID."

**{¶81}** At appellant's sentencing hearing, after sentencing appellant to three years in prison, the trial court stated:

**{¶82}** "I'm going to recommend postrelease control. So when you're released from prison you *may* be subject to a term of postrelease control. The ultimate decision is up to the parole board and, I believe, the Department of Corrections." (Emphasis added; Sentencing Tr. 8).

**{¶83}** And in its judgment entry, with regard to postrelease control, the court stated:

**{¶84}** "Upon completion of the prison term, the offender *may* be subject to a period of **Post-Release Control (PRC)** up to **three (3) years** as determined by the Parole Board pursuant to R.C. 2967.28. The Court recommends the Defendant be put on the maximum period of post release control." (Emphasis added.)

**{¶85}** In this assignment of error, appellant argues that the trial court did not include the proper period of postrelease control in his sentence. He points out that

for a third-degree felony where the defendant caused or threatened physical harm, postrelease control is for a period of three years.

{¶86} R.C. 2967.28(B) provides in pertinent part:

{¶87} "(B) Each sentence to a prison term for a felony of the first degree, for a felony of the second degree, for a felony sex offense, or for a felony of the third degree that is not a felony sex offense and in the commission of which the offender caused or threatened to cause physical harm to a person *shall* include a requirement that the offender be subject to a period of post-release control imposed by the parole board after the offender's release from imprisonment. If a court imposes a sentence including a prison term of a type described in this division on or after July 11, 2006, the failure of a sentencing court to notify the offender pursuant to division (B)(3)(c) of section 2929.19 of the Revised Code of this requirement or to include in the judgment of conviction entered on the journal a statement that the offender's sentence includes this requirement does not negate, limit, or otherwise affect the mandatory period of supervision that is required for the offender under this division.

{¶88} "* * *

{¶89} "(3) For a felony of the third degree that is not a felony sex offense and in the commission of which the offender caused or threatened physical harm to a person, *three years.*" (Emphasis added.)

{¶90} Per the terms of the statute, appellant is correct. In the commission of his offense, appellant clearly caused physical harm to Armstrong. Consequently, the trial court erred in informing appellant that he *may* be subject to postrelease control and that the decision as to how much time was up to the parole board. Instead, postrelease control of three years was statutorily mandated.

{¶91} At oral argument, appellant agreed with the state that the Ohio State Supreme Court set out the proper remedy for this error in *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434. See also *State v. Mock*, 7th Dist. No. 08-MA-94, 2010-Ohio-2747.

**{¶92}** In *Singleton*, upon sentencing the defendant, the trial court improperly stated that he was subject only to the *possibility* of five years postrelease control and it did not specify that the parole board could impose an additional prison term of up to one-half of his prison sentence for a violation of postrelease control. The court of appeals agreed and remanded the matter for a de novo resentencing hearing. The state appealed arguing that prior to the expiration of a prison term, a trial court may correct a sentence lacking a mandatory term of postrelease control pursuant to R.C. 2929.191, which was enacted on July 11, 2006.[1]

**{¶93}** The Ohio Supreme Court acknowledged its prior holdings that when a trial court imposes a sentence without properly notifying the defendant of postrelease control, the sentence is contrary to law and void. Id. at ¶14, citing *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, *State v. Beasley* (1984), 14 Ohio St.3d 74. However, the Court noted that before the enactment of R.C. 2929.191 in July 2006, there was no statutory mechanism to correct a sentence that failed to comport with

---

1        **{¶ a}** R.C. 2929.191 provides in pertinent part:

**{¶ b}** "(A)(1) If, prior to the effective date of this section, a court imposed a sentence including a prison term of a type described in division (B)(3)(c) [first- or second-degree felony, felony sex offense, or third-degree felony where offender threatened or caused physical harm] of section 2929.19 of the Revised Code and failed to notify the offender pursuant to that division that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison or to include a statement to that effect in the judgment of conviction entered on the journal or in the sentence pursuant to division (F)(1) of section 2929.14 of the Revised Code, at any time before the offender is released from imprisonment under that term and at a hearing conducted in accordance with division (C) of this section, the court may prepare and issue a correction to the judgment of conviction that includes in the judgment of conviction the statement that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison.

**{¶ c}** "* * *

**{¶ d}** "(C) On and after the effective date of this section, a court that wishes to prepare and issue a correction to a judgment of conviction of a type described in division (A)(1) or (B)(1) of this section shall not issue the correction until after the court has conducted a hearing in accordance with this division. Before a court holds a hearing pursuant to this division, the court shall provide notice of the date, time, place, and purpose of the hearing to the offender who is the subject of the hearing, the prosecuting attorney of the county, and the department of rehabilitation and correction. The offender has the right to be physically present at the hearing, except that, upon the court's own motion or the motion of the offender or the prosecuting attorney, the court may permit the offender to appear at the hearing by video conferencing equipment if available and compatible. An appearance by video conferencing equipment pursuant to this division has the same force and effect as if the offender were physically present at the hearing. At the hearing, the offender and the prosecuting attorney may make a statement as to whether the court should issue a correction to the judgment of conviction."

the statutory postrelease control requirements. Id. at ¶22. But the Court observed that with R.C. 2929.191, the legislature provided a statutory remedy to correct a failure to properly impose postrelease control. Id. at ¶23. It explained:

**{¶94}** "Effective July 11, 2006, R.C. 2929.191 establishes a procedure to remedy a sentence that fails to properly impose a term of postrelease control. It applies to offenders who have not yet been released from prison and who fall into at least one of three categories: those who did not receive notice at the sentencing hearing that they would be subject to postrelease control, those who did not receive notice that the parole board could impose a prison term for a violation of postrelease control, or those who did not have both of these statutorily mandated notices incorporated into their sentencing entries. R.C. 2929.191(A) and (B). For those offenders, R.C. 2929.191 provides that trial courts may, after conducting a hearing with notice to the offender, the prosecuting attorney, and the Department of Rehabilitation and Correction, correct an original judgment of conviction by placing on the journal of the court a nunc pro tunc entry that includes a statement that the offender will be supervised under R.C. 2967.28 after the offender leaves prison and that the parole board may impose a prison term of up to one-half of the stated prison term originally imposed if the offender violates postrelease control." Id.

**{¶95}** The Court further pointed out that the R.C. 2929.191 hearing pertains only to the "flawed imposition of postrelease control" as the General Assembly apparently intended to "leave undisturbed the sanctions imposed upon the offender that are unaffected by the court's failure to properly impose postrelease control at the original sentencing." Id. at ¶24.

**{¶96}** Consequently, the Court held:

**{¶97}** "1. For criminal sentences imposed prior to July 11, 2006, in which a trial court failed to properly impose postrelease control, trial courts shall conduct a de novo sentencing hearing in accordance with decisions of the Supreme Court of Ohio.

**{¶98}** "2. For criminal sentences imposed on and after July 11, 2006, in which a trial court failed to properly impose postrelease control, trial courts shall

apply the procedures set forth in R.C. 2929.191." Id. at paragraphs one and two of the syllabus.

{¶99} Because appellant was convicted and sentenced after the July 11, 2006, enactment of R.C. 2929.191 and is still serving his prison sentence, the proper procedure here is to remand the matter to the trial court to hold a hearing pursuant to R.C. 2929.191(C) while keeping the remainder of appellant's sentence intact.

{¶100} Accordingly, appellant's fourth assignment of error has merit.

{¶101} For the reasons stated above, appellant's conviction is hereby affirmed. The matter is remanded to the trial court for the limited purpose of an R.C. 2929.191 hearing to correct the postrelease control portion of appellant's sentence.

Vukovich, P.J., concurs.

Waite, J., concurs.