[Cite as *State v. Ballard*, 2024-Ohio-6074.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

STEVIE ASHAUDE LYDELL BALLARD,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0033**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2021 CR 00794

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor and *Atty. Edward A. Czopur*, Assistant Prosecutor, for Plaintiff-Appellee

*Atty. Michael A. Partlow*, for Defendant-Appellant

Dated: December 18, 2024

**WAITE, J.**

{¶1} Appellant Stevie Ashaude Lydell Ballard appeals a February 23, 2024 judgment entry of the Mahoning County Court of Common Pleas convicting him on various offenses related to a shooting incident. Appellant argues that the court improperly permitted introduction of statements made by a witness who did not testify, and allowed testimony regarding prior bad acts. Appellant also challenges the manifest weight of the evidence supporting his convictions. For the following reasons, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} The incident occurred on November 18, 2021, outside of the Westminster Apartment complex in Austintown. A Jeep pulled up near the complex and the driver spoke to Appellant briefly. Appellant pulled a firearm from his waistband and exchanged gunfire with the driver. After several rounds were fired, the Jeep drove away and Appellant fled on foot, continuing to fire as he left the area. While multiple shots were fired, no one was injured.

{¶3} Several officers were dispatched to the area around 9:28 a.m. Because the officers did not know whether the shooting was an isolated incident or part of a larger violent spree, they focused on learning the names of the individuals involved, and their locations. However, by the time the officers arrived, they had no information about a suspect and both individuals involved had left the area.

{¶4} Police were able to locate two women who had information about the shooting. The first, Sharon Berry, actually witnessed the shooting, and was able to identify Appellant as one of the men involved. Berry explained she had been outdoors at

the time of the shooting. Berry informed officers that she saw Appellant, with whom she was familiar, walking on the sidewalk and then saw a white Jeep pull up near the complex. She noticed that the Jeep's driver remained in the vehicle. She saw Appellant and the driver engage in a conversation. She observed Appellant pull a firearm from his waistband and fire at the vehicle. Appellant and the driver then exchanged fire. She ran inside as she saw the Jeep pull away and Appellant flee on foot while he continued firing.

{¶5}    Berry's identification of Appellant was a central issue during trial. While she admittedly did not see the shooter's face, because it was covered by some sort of winter mask, she knew it was him because of her general familiarity with him, having seen him previously around the neighborhood. She described Appellant as wearing grey sweatpants and a black hooded sweatshirt or jacket at the time of the shooting. She told officers that his girlfriend's vehicle, which she had seen him in several times, was a tan or gold-colored compact car.

{¶6}    She explained to officers that she frequently observed Appellant coming and going from the complex, which is across the street from her home. She noted that she paid particular attention to him, as once she saw him remove a firearm from his waistband and place it in the trunk of his girlfriend's vehicle. She later saw him return to the trunk and retrieve the firearm, returning it to his waistband.

{¶7}    Another neighbor also witnessed the shooting. Neither Berry nor the second neighbor could provide any information about the other participant, the driver of the Jeep. They were able to describe the vehicle as a white-colored Jeep. They informed officers that the Jeep had been parked in a neighbor's driveway, and that they believed

Case No. 24 MA 0033

that neighbor knew the Jeep's driver, who was the second suspect. They informed officers that the neighbor in question drove a black sedan.

{¶8} Officers went to the residence described by Berry and the other neighbor and observed the black sedan driving down the road towards that residence. Officers approached the sedan and spoke to the driver, Chuntelle Price. Price was initially reluctant to provide any information due to fear for her safety, but Officer Kriebel informed her that she could remain anonymous. After receiving this assurance, she advised Officer Kriebel that the man in the white Jeep was Tray Hill, and identified Appellant as "Stevie Calhoun." She showed Officer Kriebel Appellant's Instagram page, which contained his photograph.

{¶9} Officer Joshua Watkins of the Austintown Police Department patrolled the area the day after the shooting and observed a gold-colored car consistent with the description of Appellant's girlfriend's car provided by Berry. Officer Watkins followed it to the apartment complex and watched Appellant exit the vehicle, and later, get back inside as a passenger. After the vehicle pulled away, Officer Watkins initiated a traffic stop, where Appellant was apprehended without incident. Hill's Jeep was also located, and he was likewise apprehended. He was tried separately for his participation in the shooting and details related to his involvement are not relevant to this appeal.

{¶10} On December 16, 2021, Appellant was jointly indicted with a codefendant, Malik Lenear. The following offenses applied to Appellant, alone: count one, aggravated burglary, a felony of the first degree in violation of R.C. 2911.11(A)(1), (B) with a three year attenuated firearm specification in violation of R.C. 2941.145(A); count two, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1), (D)(1)(a) with a

three year attenuated firearm specification in violation of R.C. 2941.145(A); count three, having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2), (B); count four, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2), (D)(1)(a) with a three year attenuated firearm specification in violation of R.C. 2941.145(A); count five, discharge of firearm on or near a prohibited premises, a felony of the third degree in violation of R.C. 2923.162(A)(3), (C)(2) with a three year attenuated firearm specification in violation of R.C. 2941.145(A); count six, having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2), (B), and count seven, carrying a concealed weapon, a felony of the fourth degree in violation of R.C. 2923.12(A)(2). The weapons disability charges stem from two juvenile cases, 16 JA 01375 JUV and 17 JA 01442 JUV, where Appellant was adjudicated on two offenses that, if committed by an adult, would have been a felony of violence.

{¶11} From the time of indictment, this matter has had a lengthy and unique procedural history. On June 2, 2023, the parties reached a plea agreement. Appellant agreed to plead guilty to counts one, four, and six in exchange for dismissal of the remaining counts. However, on September 15, 2023, the trial court sustained Appellant's motion to withdraw this plea and preparation for trial commenced.

{¶12} Apparently, two witnesses, Price and Brandon Pendland, ceased to cooperate with the state and failed to attend scheduled interviews, leading the prosecutor to become concerned about their trial attendance as key witnesses. On the state's motion, the trial court held a hearing to determine if a recognizance bond was necessary to secure their attendance, however, Pendland failed to appear and a warrant was issued for his arrest. As to Price, the court ordered a $1,000 bond to secure her attendance, and

required her to wear a GPS monitoring device. The state could not locate Pendland, and was forced to dismiss counts one, two, and three of the indictment, each of which pertained to crimes where Pendland was the victim. Because Pendland failed to cooperate, the record does not contain much information as to these crimes.

{¶13} Appellant waived jury trial on the single weapons disability charge remaining. Following a two day trial, the jury convicted Appellant on all offenses that remained (counts four, five, six, and seven). The court found Appellant guilty of the weapons disability charge.

{¶14} On February 23, 2024, the court imposed the following: an indefinite sentence of one to two years of incarceration on count four (felonious assault) and three years for the attenuated firearm specification, one year of incarceration on count five (discharge of a firearm on or near a prohibited premises) and three years on the attenuated firearm specification, one year of incarceration on count six (weapons disability), and one year of incarceration on count seven (concealed carry). As required by law, the court ordered the firearm specifications to run consecutive and prior to the sentences on the remaining convictions. The court then ordered all of these sentences to run consecutively, for an aggregate total of eleven to twelve years of incarceration, with credit for 624 days served.

{¶15} On appeal, we note that resolution of this matter has been considerably delayed by Appellant and his counsel. Appellant filed a thirty-day extension to file his brief, however, this court granted only twenty days due to the age of the case. Appellant then filed a second motion for extension, seeking an additional fifteen days. This request was granted in full, and we noted that this was Appellant's final extension. Despite this,

counsel then filed a request for an additional seven days due to an appeal he was in the process of working on in another appellate district. This Court granted the motion and allowed for an additional four days for a total of eleven extra days. Despite receiving several extensions and our admonishment that "no further extensions will be given," Appellant requested a fourth extension. While this was still pending, Appellant did file his brief, well beyond all deadlines. In the interest of justice, this Court accepted his brief instanter. Appellant's brief was filed a total of eighty-one days after the last transcript was filed.

{¶16} Oral argument was scheduled in this matter for October 2, 2024. The scheduling entry was mailed to the parties on August 5, 2024. On September 23, 2024, Appellant's counsel filed a motion to continue the hearing. Although the motion was untimely and further delayed the matter, again in the interest of justice, we granted the motion.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT ERRED IN PERMITTING HEARSAY TESTIMONY FROM MS. PRICE.

{¶17} Appellant argues that the state offered statements made by Ms. Price linking him to the alias "Stevie Calhoun" at trial, despite the fact that Ms. Price did not testify. The statements were introduced to the jury through the bodycam video of the officer. Appellant contends that these statements are inadmissible hearsay and also run afoul of the confrontation clause. Appellant explains that as Ms. Price did not witness the shooting, her statements to police cannot be considered as an excited utterance.

<u>Case No. 24 MA 0033</u>

Additionally, because these statements implicated Appellant as the shooter, the confrontation clause prohibits the statements from being admissible.

**{¶18}** The state responds that the statements are admissible pursuant to the "present sense impression" exception to hearsay. The state highlights the timeline of the incident: officers were dispatched to the scene at 9:38 a.m. and officers spoke to Price at 10:04 a.m. When officers located Ms. Price, approximately one-half of an hour had passed and Appellant had not been fully identified, as his name was not known. At the time officers spoke to Ms. Price, the following facts are relevant: firearms were used to commit a crime, the shooters remained at large, the shooting occurred in a residential neighborhood during the daytime hours and in a well-traveled area, police responded quickly to the scene and were actively investigating, and the statement at issue was made at the scene and not in the police station. The state concludes that all of these facts show there was an ongoing emergency which required police to act quickly to apprehend the shooter before another incident could occur.

**{¶19}** While the parties disagree whether any of the hearsay exceptions apply, Appellant takes particular exception to the present sense impression exception. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *State v. Given*, 2016-Ohio-4746, ¶ 24 (7th Dist.), citing Evid.R. 801(C). "Hearsay is generally not admissible, except as provided by the United States or Ohio Constitutions, by statute, or court rule." *Id.,* citing Evid.R. 802. A trial court's evidentiary rulings are reviewed for an abuse of discretion where there has been a proper objection. *State v. Mauldin*, 2010-Ohio-4192, ¶ 70 (7th Dist.).

{¶20} Pursuant to Evid.R. 803(1), a present sense impression constitutes "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." A present sense impression is properly an exception to the hearsay rule even when the declarant is available as a witness. *Id.* In essence, such statement is considered more trustworthy, as it is based on a person's immediate perception of an event.

{¶21} Generally, in reviewing whether a statement falls within this exception, two circumstances surrounding the statement are reviewed: (1) whether the declarant made the statement to a person capable of verifying the information, and (2) whether the statement was made in close proximity in time to the perceived event. *Given* at ¶ 32.

{¶22} As to the first prong, Officer Kriebel immediately took steps to corroborate Price's identification of Appellant. He obtained Appellant's Instagram account from Price and compared a photograph in the account to Appellant's BMV records. He also discovered Appellant's Facebook account, and compared photographs found there as well. He then arranged a photo array lineup, where Berry, who earlier identified the shooter, successfully identified Appellant. While Price knew Appellant as "Stevie Calhoun," police were able to use their prior familiarity with Appellant along with his social media photographs and references contained within social media to an apparent nickname to link the name "Stevie Calhoun" to "Stevie Ballard," Appellant's legal name.

{¶23} As to the second prong, Price spoke to police approximately one-half of one hour after the shooting. At this time, officers were attempting to learn the identity of the shooters, who remained at large. The officers spoke to Ms. Price close in time to the

shooting. This testimony was properly admitted under the present sense impression exception to the hearsay rule.

**{¶24}** At the time Officer Kriebel first made contact with Ms. Price, he had already learned from Ms. Berry that the driver of the white Jeep (Tray Hill) had been parked in Price's driveway sometime prior to the shooting. Price initially refused to provide his name, but after receiving assurances that she could remain anonymous, she informed Officer Kriebel that the man in the white Jeep was Tray Hill. She was also able to identify the other man who was likely the shooter. She identified Appellant, whom she knew as "Stevie Calhoun" and showed the officer Appellant's Instagram page, which contained Appellant's photo.

**{¶25}** The Confrontation Clause affords a criminal defendant the right "to be confronted with the witnesses against him." U.S. Constitution, Sixth Amendment. "Pursuant to the United States Supreme Court, the confrontation clause bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *State v. Williams*, 2021-Ohio-1285, ¶ 63 (7th Dist.), quoting *Crawford v. Washington*, 541 U.S. 36 (2004).

**{¶26}** The state relies on the "ongoing emergency" analysis to support this testimony. Although not cited by the parties, the Eighth District recently addressed an analysis of this hearsay exception in *State v. Johnson*, 2023-Ohio-445 (8th Dist.).

> The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is

testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. * * * [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." (Internal citations omitted)

*Id.* at ¶ 39.

**{¶27}** The *Johnson* court defined the term "emergency":

An "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action," "an urgent need for assistance or relief." Merriam-Webster's Online Dictionary, available at https://www.merriam-webster.com/dictionary/emergency (accessed Jan. 20, 2023); see also Wex, Cornell Law School Legal Information Institute, available at https://www.law.cornell.edu/wex/emergency (accessed Jan. 20, 2023) (defining "emergency" as "an urgent, sudden, and serious event or an unforeseen change in circumstances that necessitates immediate action to remedy harm or avert imminent danger to life, health, or property; an exigency").

*Id.* at ¶ 52.

**{¶28}** The state cites to *State v. Craig,* 2020-Ohio-1102 (7th Dist.). In *Craig,* law enforcement responded to a shooting that occurred in front of a Walmart store. The

shooter fled in a vehicle, leaving the victim at the scene. This Court determined the situation amounted to an ongoing emergency, because the statement was given "in the minutes after the shooting where the scene at the store was chaotic, the shooting victim was yelling that he was going to die, and his friend (who was steps away from the shooting as it occurred) was speaking to law enforcement who had just arrived on scene. The stability of the state of affairs at the scene was as yet unknown. The shooter had not been apprehended, and his immediate fleeing from the scene in a motor vehicle mere minutes before represented an emergency situation and a danger to the public." *Id.* at ¶ 43.

{¶29} While certain aspects of *Craig* are similar, the facts are not completely analogous, as in *Craig* we heavily relied on the chaos surrounding a situation where there was a severely injured victim and the statement was made by his friend, who witnessed the incident. Neither of these facts are present, here. In its own way, however, the instant situation did have chaotic elements. An incident erupted in front of a residence in broad day in a heavily travelled neighborhood where multiple shooters participated, and both of those participants had recently fled the scene. There is undisputed testimony that an ongoing emergency existed. A shooting had occurred approximately one-half hour earlier and both shooters were at large, their identities unknown. The motive for the shooting, and whether another shooting may be imminent, was also unknown to police. Ms. Price, the witness whose statement is at issue, was herself concerned that the shooter may return and attempt to "shoot up" her house.

{¶30} In addition to present sense impression, the testimony at issue also shows the course of the ongoing investigation and is part of that investigation. The issue in this

matter is similar to *State v. Williams*, 2021-Ohio-1285 (7th Dist.). In *Williams*, a detective testified that a certain witness' testimony was consistent with that of her friend, who provided a statement to police but did not testify at trial. The friend did not see the incident occur, but learned what had happened from the eyewitness. She informed investigating officers that the eyewitness wanted to tell the truth, but feared for her safety. After this, police reinterviewed the eyewitness. This time, they believed she told the truth, as it matched what she had earlier told her friend. The state used the eyewitness statement, even though she did not testify, to explain why they found the testifying witness (her friend) was believable.

**{¶31}** We held that the detective properly testified about the statement made by a witness who did not appear at trial. This was permissible, as it constituted the next step of the investigation. We explained the investigatory "next step" exception:

> The "next step" exception discussed in *James* is more fully described within *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181. "Law-enforcement officers may testify to out-of-court statements for the nonhearsay purpose of explaining the next investigatory step." *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 172, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186. "Testimony to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the

danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged." *Ricks, supra*, at ¶ 27.

*Id.* at ¶ 68.

**{¶32}** Here, Officer Kriebel's testimony regarding Ms. Price's statement pertains to steps he took during the investigation. One critical aspect of the investigation was to learn the identity of the shooters. At the time, police had already had some evidence implicating Appellant (although they did not know his name), and they were next attempting to learn the identity of the second shooter. Thus, Ms. Price's statement was relevant. Because police already had statements linking Appellant to the crime, and Ms. Price's statement only provided them with an alias for Appellant, her statement served to supplement Ms. Berry's actual eyewitness identification. The probative value of her statement, which gave police Appellant's alias, was not outweighed by unfair prejudice.

**{¶33}** Importantly, Price did not witness the shooting. Investigators already had a lead as to the shooter's identity based on Berry's statements. Berry was also provided a photo array and identified Appellant's photograph with one hundred percent surety. She also described the vehicle Appellant used, where he was ultimately apprehended and arrested. Thus, while Berry's evidence primarily identified Appellant and connected him to the shooting, Price assisted the investigation by telling the officers the name of the second suspect and the alias of the man she believed was most likely the initial shooter, Appellant.

**{¶34}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY PERMITTING DETECTIVE MCGLYNN'S TESTIMONY CONCERNING A PRIOR INVESTIGATION HE HAD CONDUCTED ALLEGEDLY INVOLVING APPELLANT.

{¶35} Appellant contends that Detective Sergeant Greg McGlynn was improperly permitted to testify regarding a prior bad act on the part of Appellant. Appellant explains that the detective was asked about his familiarity with the names "Stevie Calhoun" and "Beno," to which he replied, "[p]rior to the investigation, I was investigating a case where Beno was involved in an incident at 69 Westminster." (Trial Tr., p. 441.)

{¶36} The state responds that nothing in the detective's statement implicated Appellant in a prior criminal offense. The statement was fairly broad, and left open the possibility that "Beno" was the victim or a witness to the "incident." There was no explanation as to what manner Appellant may have been "involved."

{¶37} Preliminarily, we note that the defense immediately objected to the testimony and Det. McGlynn gave no further testimony relating to the prior incident. We also note that the testimony specifically referred to Appellant's alias and apparent nickname, and did not mention Appellant's legal name. While evidence was offered linking Appellant to the name "Beno," it was for the jury to determine whether sufficient and credible evidence was submitted to show Appellant was the same person as "Beno."

{¶38} Regardless, as noted by the state, Det. McGlynn's statement in no way implicated Appellant in a "bad act." The question asked whether the detective was familiar

Case No. 24 MA 0033

with the name "Beno," and he responded only that "Beno" had been "involved" in "an incident."

**{¶39}** In Ohio, generally speaking, evidence of a prior bad act is inadmissible. This law is found in Evid.R. 404(B) which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶40}** However, there are exceptions to this rule, and some instances of prior bad acts may be admissible. "The admission of such [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice." *State v. Morris*, 2012-Ohio-2407, ¶ 14.

**{¶41}** The Ohio Supreme Court created a three-step analysis when reviewing the admissibility of a prior bad:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.

Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

*State v. Williams*, 2012-Ohio-5695, ¶ 20.

**{¶42}** As to the first prong, there is no question that Appellant's alias is relevant, as it eventually led officers to his true identity.

**{¶43}** As to the second prong, Det. McGlynn never described Appellant's role in his prior investigation, and certainly never said Appellant was the suspect. In addition, no information was provided as to that investigation, or whether it resulted in further legal action.

**{¶44}** As to the third prong, the testimony was offered to show Det. McGlynn's familiarity with Appellant, whom he knew as Beno. The officers were shown a photograph of Appellant, but were given a different name. The officers' familiarity with Appellant and his alias or nickname led them to his true identity.

**{¶45}** Because Det. McGlynn's testimony did not identify Appellant as a participant in a prior bad act, but merely stated that he was "involved" in some undefined way in a prior "incident," the testimony was not impermissible. Appellant's second assignment of error is also without merit and is overruled.

Case No. 24 MA 0033

ASSIGNMENT OF ERROR NO. 3

APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶46} Appellant argues that there is no real evidence that he was the shooter. He first complains there was a lack of physical evidence, such as DNA or fingerprints, and no gun was ever found, so no gun linked him to the crime. He questions the value of Ms. Berry's identification, as she admittedly did not see his face and recognized him solely by his mannerisms and his walk, but did not specify what was distinctive about his walk. He also claims that she described the shooter as wearing a grey hoodie, while he was found wearing a black hoodie. He contends that he fully cooperated with the investigation.

{¶47} In response, the state explains that Ms. Berry was very familiar with Appellant, as she routinely saw him in the area and was familiar with his girlfriend and his vehicle. She testified that she was one hundred percent sure he was the shooter. The state contradicts Appellant's argument regarding the clothing worn by Appellant, as the state accurately contends Berry described the shooter as wearing a black hoodie and gray pants, which is what Appellant wore at the time he was apprehended. The state cites Berry's positive identification of Appellant in a photo array and officers' familiarity with Appellant. The state also raises the investigator's ability to verify Appellant's identify by comparing his photographs on his social media accounts with his BMV photographs.

{¶48} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). It is not a

question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins*, at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶49} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State* v. Hunter, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶50} This record contains an overwhelming amount of evidence linking Appellant to the shooting. Berry provided the key evidence, which included her photo array

Case No. 24 MA 0033

identification and a description of the type of vehicle Appellant would likely be using. Appellant was found in that vehicle, and was wearing the clothes Berry had described to police in her description of the shooter, contrary to what Appellant now asserts. Officers were able to link Ms. Berry's descriptions to Appellant's name by piecing together an alias provided by Ms. Price and using certain officers' familiarity with Appellant and his nickname. Although Ms. Price did not know Appellant's actual last name, officers were able to use photographs from the Instagram page she showed them to compare to BMV photographs, as they were familiar with Appellant.

{¶51} Accordingly, Appellant's third assignment of error is without merit and is overruled.

Conclusion

{¶52} Appellant argues that the court improperly permitted statements to be introduced made by a witness who did not testify, and allowed testimony regarding evidence of prior bad acts. Appellant also challenges the manifest weight of the evidence in support of his convictions. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Robb, P.J. concurs.

Hanni, J. concurs.

Case No. 24 MA 0033

---

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**