[Cite as *State v. McClain*, 2014-Ohio-93.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

      Plaintiff-Appellee/           :
      Cross-Appellant,                              No. 13AP-347
                                    :          (C.P.C. No. 12CR-5149)

v.                                          :

                                    :          (REGULAR CALENDAR)
Ashon McClain,

                                    :

      Defendant-Appellant/
      Cross-Appellee.               :

---

D E C I S I O N

Rendered on January 14, 2014

---

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for
appellee/cross-appellant.

*Nemann Law Offices* and *Adam Lee Nemann*, for
appellant/cross-appellee.

---

APPEAL from the Franklin County Court of Common Pleas

O'GRADY, J.

{¶ 1} Defendant-appellant/cross-appellee, Ashon McClain, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of abduction and domestic violence, merging the offenses, and sentencing him for domestic violence. Plaintiff-appellee/cross-appellant, State of Ohio, cross-appeals from the judgment arguing the trial court erred by merging these offenses. For the following reasons, we affirm the trial court's findings of guilt, but reverse McClain's sentence and remand for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}  McClain was indicted on one count of abduction, in violation of R.C. 2905.02(A)(2), and one count of domestic violence, in violation of R.C. 2919.25(A) and (D)(4).  McClain pleaded not guilty to the charges and waived his right to a jury trial.

{¶ 3}  At the bench trial, Christina Palmer testified she met McClain in March 2012, and they immediately started dating.  In May or June 2012, she moved in with him into a house on Kossuth Street.  McClain went to jail for a short time because of domestic violence against her, but she still lived with him after he got out.  In June 2012, Palmer was convicted of a fifth-degree felony theft offense and was still on probation at the time of trial.  She was in jail from mid-August to the end of September 2012.  After she got out of jail, she and McClain stayed with his aunt, so they lived together again but at a different address.

{¶ 4}  On the evening of October 1, 2012, Palmer and McClain used cocaine at his aunt's home and McClain also drank beer.  Palmer probably had a line or two of cocaine every hour for about five or six hours.  Around midnight, she and McClain left because McClain got into a fight with his aunt and her boyfriend.  Palmer and McClain visited an acquaintance of McClain's, who might have been his uncle.  About 20 minutes after they arrived at the uncle's apartment, McClain told Palmer she was making him angry, called her an array of names, and punched her thigh with a closed fist.

{¶ 5}  Palmer got up, put her hoodie on, grabbed her purse, left, and walked away from the apartment.  She made it past about three apartment buildings when McClain caught up to her and tackled her on the sidewalk.  McClain put his knee on her thigh and wrapped his hands around her neck.  He punched her in the face about three times, pulled her hair out, and choked her.  Palmer felt her rib crack under his knee.  She could not get away and was terrified.  She screamed for help, and a man came to her aid with a big knife and told McClain to get off of her.  McClain did, and Palmer ran towards an apartment building.  Palmer, McClain, and the man with the knife stayed on the scene until police and medics arrived.  Medics advised her to go to the hospital, but she did not.  Palmer testified that, due to the incident, her elbow was swollen.  The next day, she had bruising under her eye and, later, a doctor said she had a broken rib.  Palmer admitted there may

have been times during the evening when she was "fuzzy" from drugs but claimed she was "more alert than not." (Tr. Vol. I, 63.) She had no drugs for at least one hour before McClain first struck her.

{¶ 6} On cross-examination, Palmer testified that at the time she met McClain she was temporarily staying with a friend. She had an apartment on Spruce Drive she shared with a boyfriend, but they were splitting up. Most of her possessions were at Spruce Drive until she moved in with McClain on Kossuth. Palmer did not know who was on the Kossuth Street lease. She admitted she owned none of the furniture at the Kossuth Street address but claimed she did have household items there, like pictures on the wall. Palmer admitted when the incident with McClain occurred, she might have given police her father's address as her own because she got mail there. She also admitted that in July 2012 she tried to get a protection order against McClain and gave her father's address as her own in that proceeding.

{¶ 7} Officer Darryl Holland with the Columbus Police Department responded to the scene of the incident between Palmer and McClain. He testified Palmer was upset, had some redness around her cheeks, and was crying.

{¶ 8} Adam Parsons testified that in the early morning of October 2, 2012, he and his wife, Miriam Green, heard what sounded like a man and woman screaming outside their apartment. Parsons and Green looked out the window, and Parsons saw a woman balled up on the ground and a man on top of her. The man seemed to be restraining her, but Parsons could not tell if he was harming her or potentially trying to pick her up. Parsons called 911. He then saw his downstairs neighbor, Terry, intervene with a large knife or machete. Terry separated the man and woman shortly before police arrived.

{¶ 9} Green heard a woman "crying in distress, get off of me, get off of me." (Tr. Vol. I, 103.) She saw two people outside—one on the ground and the other bending over the person on the ground. Green could not see well because she was not wearing her glasses or contacts. She could not tell if the man was trying to help or harm the woman.

{¶ 10} Over McClain's objection, the trial court admitted into evidence a recording of a 911 call by Terry Simmons, the man who aided Palmer. On the recording, a woman is making distressed sounding noises, and it appears Simmons is telling McClain to "back up off of her now," that he is going to jail, and that nobody "deserves * * * that." (State's

exhibit No. 8.)  Simmons later tells the 911 operator the man is "drunk" and "beating the hell out of this girl."  (State's exhibit No. 8.)  Additionally, Simmons indicates he separated the man and woman by threatening the man with a machete.

{¶ 11} The trial court found McClain guilty of both counts.  Over the state's objection, the trial court found the counts merged for purposes of sentencing.  At the state's election, the trial court sentenced McClain on the domestic violence count to three years in prison.

## II.  ASSIGNMENTS OF ERROR

{¶ 12} McClain appeals and presents this court with three assignments of error for our review:

> First Assignment of Error:
>
> THE TRIAL COURT COMMITTED ERROR WHEN IT ADMITTED THE 911 TELEPHONE CALL AS AN "EXCITED UTTERANCE" TO THE HEARSAY EXCEPTION.
>
> Second Assignment of Error:
>
> THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> Third Assignment of Error:
>
> THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILTY.

{¶ 13} The state cross-appeals and presents this court with one cross-assignment of error for our review:

> THE TRIAL COURT ERRED IN MERGING THE ABDUCTION AND DOMESTIC-VIOLENCE COUNTS.

## III.  DISCUSSION

A.  *Admission of 911 Recording*

{¶ 14} Under his first assignment of error, McClain contends the trial court erred when it admitted the recording of Simmons' 911 call into evidence.

{¶ 15} The trial court found the Confrontation Clause of the Sixth Amendment to the United States Constitution ("Confrontation Clause") did not prohibit the admission because Simmons' statements were not testimonial.  The trial court also found, under

state evidentiary rules, the recording was admissible based on the excited utterance exception to the hearsay rule. In the assigned error, McClain specifically mentions the excited utterance ruling but not the Confrontation Clause ruling. Nonetheless, much of his argument is dedicated to the Confrontation Clause. Although, under App.R. 12(A), we are to determine the appeal on the assignments of error set forth in the briefs, in the interests of justice we will address McClain's Confrontation Clause argument in addition to his excited utterance argument.

{¶ 16} McClain argues the Confrontation Clause prohibits admission of the recording. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." "[T]he Confrontation Clause bars admission of testimonial statements unless the witness appears at trial or, if the witness is unavailable, the accused had a prior opportunity for cross-examination." *State v. Clark*, ____ Ohio St.3d ____, 2013-Ohio-4731, ¶ 19, citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004). "The Confrontation Clause does not apply to nontestimonial hearsay." *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 29, citing *State v. Cassell*, 10th Dist. No. 08AP–1093, 2010-Ohio-1881, ¶ 24, citing *Crawford* at 68. " 'We review a claim that a criminal defendant's rights have been violated under the Confrontation Clause de novo.' " *State v. Dennison*, 10th Dist. No. 12AP-718, 2013-Ohio-5535, ¶ 61, quoting *State v. Arnold*, 10th Dist. No. 07AP-789, 2008-Ohio-3471, ¶ 9, *rev'd in part on other grounds*, 126 Ohio St.3d 290, 2010-Ohio-2742.

{¶ 17} In *Crawford*, the United States Supreme Court "did not expressly define 'testimonial statements,' but it indicated the term at least included ex parte in-court testimony or its functional equivalent, extrajudicial statements contained in formalized testimonial materials such as affidavits and depositions, and 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Marrero*, 10th Dist. No. 10AP-344, 2011-Ohio-1390, ¶ 33, quoting *Crawford* at 51-52, quoting Brief for National Assoc. of Criminal Defense Lawyers as Amici Curiae, 3.

{¶ 18} Two years after *Crawford*, the United States Supreme Court revisited the issue of testimonial statements in the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006). As the Supreme Court of Ohio has explained:

Both cases involved statements by domestic-violence victims who did not testify at trial: in *Davis*, the victim made statements to a 9–1–1 operator identifying her assailant and describing his whereabouts immediately after an assault, whereas in *Hammon*, the victim made statements to police officers responding to a domestic-violence complaint after they had secured the scene. In those cases, the court distinguished police interrogations that relate to an ongoing emergency from those that relate to past criminal conduct. In considering whether the statements made in the context of those two different situations were testimonial, the court formulated the primary-purpose test: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Clark* at ¶ 20, quoting *Davis* at 822.

{¶ 19} The United States Supreme Court assumed, without deciding, that the acts of a 911 operator constituted acts of police. *Davis* at 823, fn. 2. Applying the primary-purpose test in *Davis*, the Supreme Court of Ohio found the objective circumstances surrounding the victim's interrogation by the 911 operator indicated " 'its primary purpose was to enable police assistance to meet an ongoing emergency.' " *Clark* at ¶ 21. The United States Supreme Court explained: (1) the victim's statements described events as they were happening, as opposed to explaining events that had happened in the past, (2) any reasonable listener would conclude the statements were made in the face of an ongoing emergency, (3) the interrogation was objectively necessary to resolve the ongoing emergency, and (4) the interrogation was informal because the interrogation was conducted over the phone and the answers were provided frantically while the victim was in an unsafe environment. *Davis* at 827. In sum, the victim "simply was not acting as a *witness*; she was not *testifying*." (Emphasis sic.) *Id.* at 828. Accordingly, the victim's statements were not testimonial and not barred by the Confrontation Clause. *See id.* at 829.

{¶ 20} Application of the primary-purpose test in *Hammon* produced a contrary result: the United States Supreme Court concluded the victim's statements were testimonial and barred by the Confrontation Clause. *See id.* at 830. There was "no immediate threat" to the victim and "no emergency in progress" when police first interacted with the victim. *Id.* at 829-30. When an officer later elicited the challenged statements, police had separated the abusive husband from the wife. *Id.* at 830. In addition, the court reasoned when the officer questioned the victim, he was "not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' " *Id.* "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.*

{¶ 21} In addition, the Supreme Court of Ohio has adopted the "objective-witness test" for evaluating "out-of-court statements made to a person who is not law enforcement." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 161. Such statements are testimonial for Confrontation Clause purposes if made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph one of the syllabus, cited with approval in *Jones* at ¶ 161.

{¶ 22} According to McClain, Simmons did not appear at trial even though he was subpoenaed and available. McClain contends there was no ongoing emergency when Simmons called 911, and McClain suggests the primary purpose of the 911 operator's questions was to establish or prove past events potentially relevant to later criminal prosecution. McClain argues he "was disarmed and had surrendered and backed away from Ms. Palmer when the 911 phone call took place." (Appellant's brief, 12.) Therefore, he did not pose a danger to "Palmer or anyone else." (Appellant's brief, 12.) He also argues Palmer's injuries were "minor" based on Officer Holland's testimony that he only observed some redness around Palmer's cheeks. (Appellant's brief, 11.)

{¶ 23} The 911 recording is approximately 2 minutes and 30 seconds long. A woman can be heard making distressed sounding noises at various times. In the first minute and 20 seconds, Simmons only appears to make one statement directed toward the 911 operator, telling her to "get somebody here now." (State's exhibit No. 8.) Simmons repeatedly tells someone, presumably McClain, to "back up off of her now."

(State's exhibit No. 8.)  Simmons also tells McClain that he is going to jail and nobody "deserves * * * that."  (State's exhibit No. 8.)  After 1 minute and 20 seconds, the operator asks Simmons for a description of the man he is talking to.  In response, Simmons tells the operator he needs a cop there now.  The operator tells Simmons police are on the way and again asks for a description, which Simmons provides.  Unprompted, Simmons then tells the operator the man is "drunk" and "beating the hell out of this girl."  (State's exhibit No. 8.)  Around 1 minute and 48 seconds into the call, the operator asks Simmons if the man is still beating the woman.  Simmons appears to indicate he separated the pair, but is standing by with a machete.  Then Simmons yells, "yeah, you better run now," presumably to McClain.  (State's exhibit No. 8.)  At 2 minutes and 8 seconds, the operator asks if the officers are there.  Simmons makes some unclear statements before sirens can be heard and the recording ends.

{¶ 24} The 911 operator was not interrogating Simmons at all during the first minute and 20 seconds of the recording.  Instead, the recording simply captures the events between McClain, Simmons, and Palmer as they were still unfolding.  Even if Simmons' statements during that time frame implicated a Confrontation Clause analysis, we agree with the state's contention that we would have to apply the objective-witness test to them.  An objective witness would not reasonably believe Simmons' statements to McClain would be available for later use at trial.  Simmons made the statements in an excited tone while trying to separate McClain from Palmer with a machete.  Thus, Simmons' statements to McClain were not testimonial and, therefore, not barred by the Confrontation Clause.

{¶ 25} Eventually, the operator did ask Simmons to describe McClain and whether McClain was still beating the woman.  Even if we presume, like the *Davis* court, that the acts of the 911 operator were the acts of police, Simmons' statements to the operator in large part described events as they were happening.  The operator's questions were objectively necessary to assist police in finding the suspect and assessing the present threat level.  The operator's interrogation was informal, and any reasonable listener would conclude Simmons' statements were made in the face of an ongoing emergency.  The interrogation occurred over the phone, and Simmons gave frantic, sometimes unresponsive, answers to the operator's questions.  It is evident Simmons believed

McClain was beating Palmer to the point Simmons felt compelled to intervene with a machete. Palmer testified to more serious injuries than McClain acknowledges. Even though it appears Simmons separated McClain and Palmer at one point, the environment remained unsafe. Both McClain and Palmer stayed on the scene, and Simmons could not know McClain's state of mind. Thus, we conclude Simmons' statements to the 911 operator were not testimonial and, therefore, not barred by the Confrontation Clause.

{¶ 26} Next, McClain contends the trial court erred in admitting Simmons' recorded statements under state evidentiary rules under the hearsay exception for excited utterances. "Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Although Evid.R. 802 provides hearsay generally is not admissible, Evid.R. 803(2) sets forth an exception for excited utterances, or "statement[s] relating to a startling event or condition made while the declarant [is] under the stress of excitement caused by the event or condition." This exception applies regardless of the declarant's availability as a witness. Evid.R. 803.

{¶ 27} Ordinarily, the admission or exclusion of relevant evidence rests within the trial court's sound discretion. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion exists when the trial court has an unreasonable, arbitrary or unconscionable attitude in reaching its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 28} The Supreme Court of Ohio applies a four-part test to determine the admissibility of hearsay statements as excited utterances. *Jones* at ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus. McClain does not argue Simmons' statements do not meet the requirements of the four-part test. Instead, he argues the trial court admitted the 911 call "without first listening to the recording" so the court "was not in a position to decide whether the declarant was under the stress of a startling event for the purposes of admissibility." (Appellant's brief, 15.) We disagree.

{¶ 29} At trial, the parties made arguments with respect to the recording's admissibility under the Confrontation Clause and state evidentiary rules. The trial court indicated it did not believe the Confrontation Clause would prohibit admission of the tape, but also indicated it could not rule on the state law evidentiary issues without listening to the recording. The trial court told the parties:

> So what I'm going to do is at this point I'm going to accept the 911. * * * I'm going to listen to it and decide whether or not after that I'm going to exclude it from my consideration or whether or not I'm going to include it as part of my consideration of the evidence.

(Tr. Vol. I, 118.)  Later, while orally giving its verdict, the trial court stated:  "I did have an opportunity to review the 911.  Based upon the tone of the caller on the 911, the Court accepted it as an excited utterance and an exception to the Hearsay rule."  (Tr. Vol. I, 147.)  Thus, contrary to McClain's contention, the trial court did listen to the recording before it made an ultimate ruling on admissibility.  Because McClain does not challenge the merits of the trial court's excited utterance ruling, we need not address that issue.

{¶ 30} McClain also argues the trial court could not admit the 911 call under the present sense impression exception to the general rule precluding the admission of hearsay.  He did not raise this issue in the assigned error.  In any event, the trial court did not admit the recording under that exception, so we need not address McClain's argument.

{¶ 31} For the foregoing reasons, we overrule appellant's first assignment of error.

B. *Sufficiency and Manifest Weight of the Evidence*

{¶ 32} Next, we address McClain's second and third assignments of error together.  Under his second assignment of error, McClain contends the trial court's verdict was against the manifest weight of the evidence.  Under his third assignment of error, McClain contends insufficient evidence exists to support the trial court's verdict.  Although unclear, we interpret McClain's arguments as an attack on the trial court's findings of guilt on both counts of the indictment even though the court ultimately only sentenced him on one count.

{¶ 33} "A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law."  *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 118, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "In reviewing such a challenge, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *Id.,* quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991),

paragraph two of the syllabus, superseded by constitutional amendment on other grounds as recognized in *State v. Smith*, 80 Ohio St.3d 89, 103 (1997), fn. 4.

{¶ 34} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court * * * disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 35} Additionally, "[t]he trier of fact is free to believe or disbelieve any or all of the testimony presented" because it is "in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *State v. Bailey*, 10th Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 23, citing *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 27. Thus, an appellate court must "give great deference to the trier of fact's determination on the credibility of the witnesses." *Id.*

{¶ 36} The trial court found McClain guilty of abduction, in violation of R.C. 2905.02(A)(2), which provides:

> No person, without privilege to do so, shall knowingly do any
> of the following: * * * (2) By force or threat, restrain the liberty
> of another person under circumstances that create a risk of
> physical harm to the victim or place the other person in fear[.]

*See* R.C. 2905.02(C) (making this offense a third-degree felony).

{¶ 37} The trial court also found him guilty of domestic violence, in violation of R.C. 2919.25(A), which states: "No person shall knowingly cause or attempt to cause

physical harm to a family or household member."  This offense was a third-degree felony under R.C. 2919.25(D)(4) since McClain had previously pleaded guilty to or been convicted of two or more offenses of domestic violence.   Under R.C. 2919.25(F)(1), "[f]amily or household member" means any of the following:

> (a) Any of the following who is residing or has resided with the offender:
>
> (i) A spouse, a person living as a spouse, or a former spouse of the offender;
>
> * * *
>
> (2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

{¶ 38} With the exception of Palmer's status as a "[f]amily or household member" for purposes of the domestic violence charge, McClain implicitly concedes the state presented evidence which, if believed, would support the other essential elements of the charged offenses.  However, he complains the testimony of the state's witnesses was not reliable.   Specifically, he complains Palmer's memory is not reliable because she: (1) admitted to using drugs throughout the day of the incident, (2) admitted her recollection of events was fuzzy, and (3) was unable to recall how she got to McClain's uncle's home.  Additionally, McClain argues Parsons and Green were unreliable because they viewed the incident from 100-115 feet away, from a second story window, while it was dark outside.  Also, Green admitted she did not see what happened clearly because she was not wearing her prescription lenses.  McClain also argues that Parsons told a 911 operator he did not see McClain strike Palmer and believed McClain was attempting to pick her up.  McClain argues these statements are consistent with a theory that he was actually aiding Palmer, who fell down "due to running around the streets of an unfamiliar neighborhood while high on excessive amounts of cocaine."  (Appellant's brief, 18.)

{¶ 39} Regarding Palmer's status as a "[f]amily or household member," McClain contends he and Palmer never lived together.  He claims she "admitted that she 'lived and

habituated at 1855 Spruce Drive' during trial." (Appellant's brief, 18.) McClain argues she was not on the lease at his Kossuth Street address, did not own any furniture there, and did not receive mail there. McClain asserts "[a]ll of her belongings remained at her apartment at 1855 Spruce Drive." (Appellant's brief, 18.) In addition, McClain argues Palmer gave police her father's address as her own the night of the incident, and admitted she "occasionally stayed" at her father's address. (Appellant's brief, 19.) McClain argues Palmer "never changed" her mailing address from her father's address. (Appellant's brief, 19.) According to McClain, if he is guilty under these facts, "anyone who dates a companion regularly in the state of Ohio is subject to a Domestic Violence situation in an everyday argument that escalates." (Appellant's brief, 19.)

{¶ 40} McClain's arguments are not persuasive. The trial court knew of Palmer's drug use and still chose to believe her testimony, which the court was free to do. Palmer testified she had no drugs for at least one hour before McClain first struck her. Although she acknowledged there may have been times during the evening when she was "fuzzy" from drug use, she testified she was "more alert than not." (Tr. Vol. I, 63.) The only detail from the evening McClain points to that Palmer could not remember was whether they took a cab to his uncle's home or a friend drove them. This is a very minor detail and does not warrant rejection of all of Palmer's testimony.

{¶ 41} Moreover, the trial court recognized the limited value of the testimony of Parsons and Green, who readily admitted they were not sure whether McClain was trying to help or hurt Palmer. However, as the trial court pointed out, their testimony was still consistent with Palmer's testimony. The fact that Parsons thought it was possible McClain was trying to carry Palmer did not compel the trial court to find McClain was aiding her in light of evidence to the contrary.

{¶ 42} With regard to Palmer's status as a "[f]amily or household member," Palmer did testify she formerly lived on Spruce Drive with a boyfriend. She claimed at the time she met McClain, her belongings were at Spruce Drive but she was temporarily staying with a friend because she was going through a break-up with the Spruce Drive boyfriend. The fact that she was not on the Kossuth Street lease and did not own furniture there is not dispositive. From Palmer's testimony, the trial court could conclude she was more than just a "companion" McClain dated. Palmer unequivocally testified that she moved in

with McClain in May or June 2012 and that she brought household items with her. She also testified that when this incident occurred, she had just gotten out of jail and was living with Palmer again but at his aunt's house. Given the number of places Palmer lived in 2012 (Spruce Drive, her friend's place, Kossuth Street with McClain, jail, and at McClain's aunt's house), it is understandable that Palmer would use her father's address—a stable address—as her mailing address.

{¶ 43} Viewing the evidence in a light most favorable to the prosecution, we conclude any rationale trier of fact could have found the state proved the essential elements of abduction and domestic violence beyond a reasonable doubt. Palmer testified she cohabitated with McClain at the time of the incident and before she went to jail, i.e., within five years prior to the incident. She testified he punched her in the thigh. Later, he tackled her on a sidewalk, punched her in the face, pulled her hair, choked her, cracked one of her ribs, and frightened her. The testimony of Parsons and Green is consistent with Palmer's account, as is Simmons' 911 call. From this evidence, the trier of fact could conclude McClain, without privilege to do so, knowingly restrained Palmer's liberty by force under circumstances that placed her in fear and created a risk of physical harm to her. The trier of fact could also conclude he knowingly caused or attempted to cause physical harm to a family or household member. Thus, we find sufficient evidence exists to support the trial court's findings of guilt. We overrule the third assignment of error.

{¶ 44} In addition, reviewing the record as a whole, we cannot say the evidence weighs heavily against the convictions, the trier of fact clearly lost its way, or a manifest miscarriage of justice has occurred. The trial court was in the best position to determine the credibility of the testimony presented. The trial court believed Palmer's testimony, and we decline to substitute our judgment for that of the trial court in this case. Because the trial court's findings of guilt are not against the manifest weight of the evidence, we overrule the second assignment of error.

C. *Merger*

{¶ 45} Under its cross-assignment of error, the state contends the trial court erred in merging the abduction and domestic violence counts.

{¶ 46} R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

" '[A] reviewing court should review the trial court's R.C. 2941.25 determination de novo.' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 67, quoting *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1.

{¶ 47} "In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Supreme Court of Ohio reviewed and revised the analysis courts employ to determine whether offenses are allied offenses of similar import under R.C. 2941.25." *Roush* at ¶ 67. Courts must ask whether the offenses "can be committed by the same conduct" and "whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' " *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., concurring in judgment only). If the answer to both questions is yes, the court must merge the allied offenses. *Id.* at ¶ 50. "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." (Emphasis sic.) *Id.* at ¶ 51.

{¶ 48} The state maintains the Supreme Court's decision in *Johnson* left untouched earlier decisions standing for the proposition that, in determining whether multiple offenses share a similar import, courts are to compare the elements to determine whether the commission of one offense will result in commission of the other offense. However, we have previously rejected the state's argument and consistently applied the *Johnson* analysis. *State v. Bryant*, 10th Dist. No. 12AP-703, 2013-Ohio-5105, ¶ 11; *State v. Damron*, 10th Dist. No. 12AP-209, 2012-Ohio-5977, ¶ 11.

{¶ 49} Here, the trial court found the abduction and domestic violence counts merged without making any findings. The state argues, in part, that McClain committed these crimes separately. McClain contends his crimes constituted a single continuous act.

{¶ 50} We agree McClain committed distinct and separate crimes. The trial court specifically found Palmer's version of events credible. According to Palmer, she and McClain cohabitated, and he punched her in the thigh while at his uncle's apartment. Such evidence supports a domestic violence conviction, but not an abduction conviction. After McClain punched Palmer, she got up, put her hoodie on, grabbed her purse, and walked away from the apartment. She made it past about three apartment buildings when McClain caught up to her, tackled her on the sidewalk, and punched her, among other things. This separate evidence supports an abduction conviction (though it could also support a second domestic violence conviction). McClain's actions did not constitute a single, uninterrupted act. Contrary to what he suggests, Palmer did not simply run out of the house when he punched her in the thigh with him in hot pursuit. Instead, Palmer took time to collect her things and walked away from the apartment, so the offenses were separated by time and occurred in different locations. *See generally Damron* at ¶ 24 (finding felonious assault and domestic violence convictions did not merge where defendant committed multiple acts of abuse punctuated by interruptions).

{¶ 51} Because McClain did not commit the abduction and domestic violence offenses in a single act, the trial court erred when it merged them. We sustain the state's single cross-assignment of error, reverse McClain's sentence, and remand for resentencing.

## IV. CONCLUSION

{¶ 52} We overrule McClain's three assignments of error. We sustain the state's single cross-assignment of error, reverse McClain's sentence, and remand for resentencing consistent with this decision.

*Judgment affirmed in part;*
*reversed in part, and cause remanded.*

KLATT & CONNOR JJ., concur.

———————————