[Cite as *State v. Walker*, 2023-Ohio-3852.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| State of Ohio, | : | No. 22AP-113 |
|  | : | (C.P.C. No. 20CR-4363) |
| Plaintiff-Appellee, | : |  |
|  | : | No. 22AP-114 |
| v. | : | (C.P.C No. 20CR-4112) |
|  | : | No. 22AP-115 |
| Jaylon Walker, | : | (C.P.C. No. 20CR-3928) |
| Defendant-Appellant. | : |  |
|  | : | (REGULAR CALENDAR) |
|  | : |  |

D E C I S I O N

Rendered on October 24, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond* for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, *Thomas F. Hayes*, and *Emily D. Anstaett* for appellant. **Argued:** *Thomas F. Hayes*.

APPEALS from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, Jaylon Walker, appeals from the judgments of the Franklin County Court of Common Pleas entered on January 25, 2022 and January 26, 2022. For the following reasons, we affirm.

## I. Factual and Procedural Background

{¶ 2} Walker's appeals, which this court consolidated sua sponte, arise from four separate criminal indictments stemming from events that took place over the course of 2020.

### a. Four Indictments

{¶ 3} Walker was indicted on August 24, 2020 in Franklin C.P. No. 20CR-3928 with the following: one count of aggravated burglary in violation of R.C. 2911.11, a felony of the first degree; one count of felonious assault in violation of R.C. 2903.11, a felony of the first degree; one count of kidnapping in violation of R.C. 2905.01, a felony of the first degree; one count of murder in violation of R.C. 2903.02, an unspecified felony; one count of improperly discharging a firearm in violation of R.C. 2923.161, a felony of the second degree; and one count of having a weapon under disability in violation of R.C. 2923.13, a felony of the third degree. Each of the first five counts carried a three-year firearm specification pursuant to R.C. 2941.145(A). The indictment arose from an incident on July 24, 2020 at the home of Brandon Augst when Devontay Stanton was fatally shot.

{¶ 4} Walker was subsequently indicted on September 2, 2020 in Franklin C.P. No. 20CR-4112 and on September 17, 2020 in Franklin C.P. No. 20CR-4363 for two alleged firearm thefts that occurred on February 17, 2020 and August 7, 2020, respectively. In both incidents, Walker was charged with the following: one count of robbery in violation of R.C. 2911.02, a felony of the second degree; one count of grand theft when the property is a firearm or dangerous ordnance in violation of R.C. 2913.02, a felony of the third degree; and one count of having a weapon under disability in violation of R.C. 2923.13, a felony of the third degree. In both indictments, the robbery and grand theft charges carried one-year firearm specifications pursuant to R.C. 2941.141(A).

{¶ 5} Also on September 17, 2020, Walker was indicted separately in Franklin C.P. No. 20CR-4362 for acts related to the July 24, 2020 shooting. He was charged with two counts of intimidation of a witness in violation of R.C. 2921.04 and two counts of retaliation in violation of R.C. 2921.05, all felonies of the third degree.

{¶ 6} On April 8, 2021, the court granted the state's motion for joinder for purposes of trial of the four indictments, which totaled 14 counts all together. Following consolidation, Walker waived his right to a jury trial on the three weapons under disability charges. The trial court dismissed both intimidation charges and one count of retaliation indicted in Franklin C.P. No. 20CR-4362 at the prosecution's request.

{¶ 7}   Trial began on the remaining eight counts on December 6, 2021, with five counts tried to a jury and three counts of weapons under disability tried to the bench.  The following evidence was adduced at trial and is reviewed here in chronological order.

### b.  Facts Relevant to Case No. 20CR-4112

{¶ 8}   On February 16, 2020, James Ford placed an advertisement to sell his gun on a website used to buy and sell firearms known as Armslist.  He received an email expressing interest and the parties agreed to meet the following afternoon to complete the sale. (Dec. 7, 2021 Tr. at 78.)  After waiting for a few minutes in the parking lot, Ford testified he was about to leave when an individual approached his car and identified himself as the buyer. Ford asked to see his concealed carry permit and the individual said he did not have it with him but showed a driver's license instead.  (Tr. at 79-81.)  The buyer then asked to see the gun.  Ford opened the case and began to put his own permit back into his wallet.  As he did, the buyer picked up the unloaded firearm, inserted ammunition, racked the gun, then fled. (Tr. at 81.)  The next day, Ford made a police report and shared with the police the email and text message communications used to arrange the sale and the serial number of the gun. (Tr. at 86.)  He later identified Walker from a photo array presented by the Columbus Division of Police and identified him in the courtroom when called to testify at trial.  (Tr. at 87, 90.)

### c.  Facts Relevant to Case No. 20CR-3928

{¶ 9}   On July 24, 2020, Shannon Peterman was at the home of his friend, Brandon Augst, playing video games with a third friend, Damarion Moon.  Peterman was 16 years old at the time.  According to Peterman's testimony at trial, Moon was robbed the day before, and the friends decided to get Moon's property back from the individual they believed was responsible for the theft. (Dec. 8, 2021 Tr. at 346.)  Peterman, Augst, and Moon drove to a residence where they believed an individual named "Quano" lived, knocked on the door, and were informed he was not there. (Tr. at 347-49.)  They left the property and returned to Augst's home—specifically his back bedroom—to continue hanging out. (Tr. at 350.)

{¶ 10} Peterman testified that not long after they returned to Augst's home, an individual named Devontay Stanton knocked on the front door.  Stanton began yelling when Augst answered, angry that Augst, Peterman, and Moon had driven to his mother's

house that afternoon making accusations about stolen property. (Tr. at 351-52.) Peterman testified at trial that he stuck his head out into the hallway to see what was happening after hearing the commotion. He recalled seeing only Stanton on the porch and Augst in the doorway before returning to the back bedroom. (Tr. at 352.) Soon after, he entered the living room after hearing further commotion and saw Stanton and Augst "tussling" on the living room floor. (Tr. at 353.) Stanton held Augst in a chokehold with his left arm and had a gun in his right hand. Peterman recalled that it sounded like Augst was trying to call for help and was struggling to breathe. (Tr. at 354.) Stanton looked up, saw Peterman, and began to yell threats in his direction. (Tr. at 357.)

{¶ 11} Peterman further testified that he then retreated to the front bedroom. He heard a loud bang, which he assumed was a gunshot, grabbed a gun he found in that bedroom, moved back into the hallway, and began shooting in the direction of the living room. (Tr. at 358-59.) He ducked into the stairwell to the house's basement, where he continued to shoot through the wall in the direction of the living room. (Tr. at 361.) He testified that he noticed the basement wall getting struck by incoming bullets, so he went back out toward the front bedroom. (Tr. at 362-63.) Peterman continued to shoot, only stopping when he accidentally struck the side of a safe in the bedroom closet. Even after he stopped shooting, he heard continuing gunfire. (Tr. at 363-64.)

{¶ 12} Peterman also testified that he entered the living room once the shooting ceased and found Augst bleeding from an injury on the right side of his head and Stanton collapsed on the living room floor with a gun by his side. (Tr. at 367.) Police officers and medics arrived soon thereafter. Peterman, Augst, and eventually Moon were placed in three separate police cruisers while medics provided care to Stanton. (Tr. at 368.) Stanton was transported to a hospital, where he was eventually pronounced dead.

{¶ 13} Augst spoke to a paramedic while in the police cruiser, which was captured on video by the cruiser's dashcam and later admitted into evidence and played for the jury as the state's Exhibit K. In the video, Augst can be seen in the back of the cruiser bleeding from a wound on his temple, in addition to several other smaller injuries. The first ten seconds show Augst pounding violently on the window and yelling in anger or pain. The windows are rolled up and the car does not appear to be on, and Augst begins to shout about the heat and dizziness he is experiencing. Eventually, a paramedic opens the door and

begins an initial assessment of Augst's injuries, during which Augst describes what just transpired:

> They took me in the door. And they said, "Who's in the house?" I was like, "A bunch of people, bro. Get the fuck outta here." They hit me with the gun. Then my little dude ran out with my brother's gun and was like, "Let him go." And then the dude pointed the gun at some [unintelligible] my little cousin ran back in the room. And they kept choking me out, saying, "Come out here right now and bring the fuckin' guns out here. We're gonna kill him. We're gonna kill him." And he pistol-whipped me again, and I got all woozy. And then they shot at somebody in my bedroom or somewhere in the hall area. And they fuckin' shot back. I don't know how I didn't get hit. I'm dude's body shield fuckin' in front of him.

(State's Ex. K at 14:19:54 to 14:20:32.)

He continues in the video:

> Yeah. He choked me. He was threatening and then that he was going to kill me if everybody didn't come into the living room. Yeah. And then my dude shot him in the shit. I turned around and looked at his dumb ass. I [unintelligible] told you to fuckin' leave. This is not the fuckin' house you want [unintelligible] up in.

(*Id.* at 14:21:46 to 14:21:58.)

{¶ 14} Augst's neighbor, Crista Williams, testified at trial that she heard multiple gunshots from the direction of Augst's home and looked out the front door to see a man with a gun running from Augst's front yard and cutting through a vacant lot adjacent to her home.

{¶ 15} Stanton's girlfriend, Quayshawna Howell, testified at trial. She recounted that on the evening of July 23, 2020, Stanton came to her home with a backpack she believed was stolen. It contained marijuana and a distinct "orange reddish" gun. (Dec. 7, 2021 Tr. at 117.) Howell later overheard Stanton arguing with Walker on the phone about how to split up the contents of the stolen backpack, "arguing about who was supposed to get what half of what." (Tr. at 141.) The next morning, Stanton borrowed Howell's car around noon. He never returned. She recalled sending Stanton several text messages asking when he planned to return. (Tr. at 119.) Several minutes after sending her last text

message, Howell answered a call from Stanton's cellphone and heard Walker exclaiming that "Devont[ay] just got shot." (Tr. at 120.) She testified that Walker told her to check on Stanton and that he had to dispose of Stanton's phone and a gun. She called back numerous times explaining Stanton had her car and keys. (*Id.*) Eventually, Walker drove to her home with an unknown woman and took Howell to her car, instructing her to find Stanton. (Tr. at 123.)

{¶ 16} Ensuing phone conversations with Walker, two of which Howell recorded, described how Walker had tried to discourage Stanton from going to Augst's house, but Stanton could not be dissuaded. (Tr. at 143.) Walker explained to her that he only got involved in the altercation at Augst's home after someone inside began shooting. He returned fire but fled once he realized he had run out of ammunition. (Tr. at 148.) Howell testified that the visit was spurred out of anger that Augst and others had shown up at Stanton's mother's home unannounced, not because Stanton had intended to rob anyone at the home. (Tr. at 146.)

{¶ 17} Walker's girlfriend, Gentry "Simone" Gilcrease, also testified at trial. Gilcrease testified that she received a phone call from Walker following the incident describing what happened. He told her Stanton had "wanted to go rob somebody." (Tr. at 155.) He told her he went along because "he felt like [Stanton] was going to die. So he wanted to go with his friend." (Tr. at 156.) Gilcrease shared her impression that Walker remained outside and never entered the residence. (Tr. at 172.)

### d. Facts Relevant to Case No. 20CR-4363

{¶ 18} After placing an advertisement to sell a gun on the Armslist website, Alex Weiland agreed to meet an interested buyer on August 7, 2020. (Dec. 9, 2021 Tr. at 429.) Weiland, along with his wife and children, were waiting in the parking lot for the buyer when a man approached the car on foot. (Tr. at 430-31.) Weiland exited the vehicle and showed the gun to the buyer. After seeing it was unloaded, the buyer grabbed the gun from Weiland and fled. (Tr. at 431.) A video of the encounter was captured by Weiland's dashboard camera and shown at trial. (State's Ex. F.) Weiland later completed a photo array and identified Walker as the person who stole his gun. He also identified Walker at trial. (Tr. at 432, 436.)

### e. Trial and Sentencing

{¶ 19} The jury trial concluded on December 10, 2021. Walker was acquitted of the retaliation charge from Franklin C.P. No. 20CR-4362 but was found guilty on all other counts submitted to the jury, including each firearm specification. The trial court found Walker guilty of all three weapons under disability charges tried to the bench. The seven guilty verdicts were journalized on December 13, 2021.

{¶ 20} The trial court conducted a sentencing hearing on January 20, 2022. In case Nos. 20CR-4112 and 20CR-4363, the trial court merged the robbery and grand theft of a firearm convictions for purposes of sentencing. (Jan. 25, 2022 Jgmt. Entry.) In both cases, Walker received an indefinite sentence of four to six years for the robbery conviction, with a 12-month consecutive sentence for the firearm specification. He received a concurrent 12-month sentence for each of the weapons under disability convictions. (Jan. 25, 2022 Jgmt. Entry.)

{¶ 21} In case No. 20CR-3928, Walker was sentenced to a mandatory life sentence with the possibility of parole after 15 years for his murder conviction, and an indefinite consecutive sentence of 16 to 20 years for the five other convictions. (Jan. 26, 2022 Jgmt. Entry.)

## II. Assignments of Error

{¶ 22} Walker timely appealed from each of the three judgment entries and asserts the following assignments of error for our review:

> [I.] The trial court erred by admitting into evidence hearsay statements of Brandon Augst.
>
> [II.] The conviction for Kidnapping is not supported by legally sufficient evidence.
>
> [III.] The Robbery convictions associated with the handgun thefts (Counts 1 and 10) are erroneous and must be vacated.
>
> [IV.] The firearm specifications associated with the handgun thefts are not supported by legally sufficient evidence.

### A. First Assignment of Error

{¶ 23} In his first assignment of error, Walker challenges the trial court's admission of a dashcam video taken in the aftermath of the shooting while Augst was locked inside a

hot police cruiser. (State's Ex. K.) Specifically, he challenges the following two statements from the video:

> They took me in the door. And they said, "Who's in the house?" I was like, "A bunch of people, bro. Get the fuck outta here." They hit me with the gun. Then my little dude ran out with my brother's gun and was like, "Let him go." And then the dude pointed the gun at some [unintelligible] my little cousin ran back in the room. And they kept choking me out, saying, "Come out here right now and bring the fuckin' guns out here. We're gonna kill him. We're gonna kill him." And he pistol-whipped me again, and I got all woozy. And then they shot at somebody in my bedroom or somewhere in the hall area. And they fuckin' shot back. I don't know how I didn't get hit. I'm dude's body shield fuckin' in front of him.
>
> * * *
>
> Yeah. He choked me. He was threatening and then that he was going to kill me if everybody didn't come into the living room. Yeah. And then my dude shot him in the shit. I turned around and looked at his dumb ass. I [unintelligible] told you to fuckin' leave. This is not the fuckin' house you want [unintelligible] up in.

(State's Ex. K.)

{¶ 24} Walker asserts that the video's presentation to the jury violated his rights under the Sixth Amendment to the United States Constitution because Augst's statements were testimonial and he did not testify at trial, and that the video contains inadmissible hearsay.

### 1. The Confrontation Clause

{¶ 25} Walker claims the dashcam video contains Augst's testimonial statements and thus playing the video for the jury without the ability to cross-examine Augst at trial violated his rights under the Confrontation Clause. We review this constitutional issue de novo. *State v. McClain*, 10th Dist. No. 13AP-347, 2014-Ohio-93, ¶ 16.

{¶ 26} "The Sixth Amendment to the United States Constitution guarantees that a person accused of committing a crime has the right to confront and cross-examine witnesses testifying against him." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 23. Thus, the Confrontation Clause generally limits the admission of statements

made by declarants who are unavailable for cross-examination at trial. *Id.* at ¶ 24, citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004). While the Confrontation Clause prohibits the admission of testimonial statements, it "does not apply to nontestimonial hearsay." *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 29. Therefore, to address Walker's first assignment of error, we must first determine whether Augst's statements on the dashcam video are testimonial. The United States Supreme Court has identified several categories of "core" testimonial statements: (1) "ex parte in-court testimony or its functional equivalent;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (Internal citations omitted.) *Crawford* at 51-52.

{¶ 27} "Statements taken by police officers in the course of interrogations" fall under this third category. *Id.* at 52. On one hand, the Supreme Court has held that a statement is nontestimonial when "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). *See also State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 183 (even "[s]tatements to police officers responding to an emergency situation are generally considered nontestimonial precisely because the declarant is usually acting—under great emotional duress—to secure protection or medical care."). On the other hand, a statement is testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* at 822.

{¶ 28} On appeal, Walker asserts the content and audience of these statements indicated there was no ongoing emergency and therefore the statements were testimonial in nature. Specifically, he asserts Augst's primary purpose in communicating with a government officer while locked in the back of a police cruiser was to " '[bear] testimony' as to what happened to him." (Appellant's Brief at 26.)

{¶ 29} At the time Augst was recorded making the objected-to statements, he was detained in the back of a police cruiser but not under police interrogation. He began his

shouting while alone in the cruiser and then made statements to a paramedic who arrived on the scene in the aftermath of the shooting. The paramedic, Lieutenant Jeff Shaw, testified at trial that he arrived at the scene with an emergency room physician accompanying him that day for training. (Dec. 9, 2021 Tr. at 447.) Once on the scene, he and the doctor approached a police car and spoke with a man (later identified at Augst) who appeared to have suffered an injury. (Tr. at 448, 450.) Lieutenant Shaw recalled that Augst was "agitated" and complained about being detained in a hot cruiser with a head injury. (Tr. at 457.) The video shows Augst speaking throughout the assessment, interspersing his answers about his injuries to the paramedic with his recollection of what happened.

{¶ 30} After Walker's first soliloquy, the video showed Lieutenant Shaw turning to someone behind him and making a brief statement. Although most of that statement is not decipherable, it clearly began with "So, the guy who was shot." (State's Ex. K at 14:20:31 to 14:20:36.) The person who received the information appeared to be wearing a white shirt and dark trousers, similar to the uniforms worn by Columbus police officers, but the record does not establish whether that person was, in fact, a law enforcement officer. Regardless, the individual walked away without addressing Augst after Lieutenant Shaw finished speaking. (*Id.*) At trial, Lieutenant Shaw was asked about this encounter. He testified that he could not recall specifically who he spoke with, but acknowledged it could have been the emergency room physician who accompanied him to the scene, a police officer, or another paramedic. (Tr. at 458.) While the identity of the third person remains unclear, Augst's eye contact and body language show his statements were directed to Lieutenant Shaw alone, and the video shows the off-camera individual approached only after Augst concluded his first soliloquy. (State's Ex. K at 14:20:31 to 14:20:36.)

{¶ 31} Ohio courts employ the " 'objective-witness test' for out-of-court statements made to a person who is not law enforcement." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 161. Under this test, a statement is deemed testimonial if "the witness would have reasonably believed that her statement would be available for use at a later trial." *Id.* As we have noted, "statements made to persons who are not law enforcement about the cause of an injury or reasons for emotional upset are generally nontestimonial and do not implicate the federal Confrontation Clause." *Columbus v. C.G.,* 10th Dist. No. 19AP-121, 2021-Ohio-71, ¶ 43. *See also State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 61-63.

When engaging in this analysis, courts are to "focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph two of the syllabus.

**{¶ 32}** A statement to medical personnel in the course of seeking and receiving assistance at the scene of an emergency is unlikely to be testimonial absent an indication the speaker believes otherwise. The Supreme Court of Ohio has previously declined to expand the categories of testimonial statements enumerated in *Crawford* to include "statements made to a medical professional for purposes of receiving medical treatment or diagnosis," even when the statement at issue identified the perpetrator in the presence of a police officer. *See Stahl* at ¶ 18. In *Stahl*, a victim identified the person who raped her to a medical professional during an emergency-room examination. Although a police officer was present in the room during the identification, the court concluded the identification was not testimonial because it was "elicited during the medical examination, came to a medical professional in the ordinary course of conducting a medical examination, and no *Miranda* warnings preceded its delivery." *Id.*

**{¶ 33}** With this in mind, we conclude Augst's challenged statements in the dashcam footage were not testimonial. Although Augst was confined to a police cruiser, he was speaking to a paramedic rendering medical aid in the immediate aftermath of his assault and a shooting inside his home. His excited state in the video footage indicates reactive, rather than reflexive, thinking. *See, e.g., State v. Taylor*, 66 Ohio St.3d 295, 300 (1993). Such reactivity and excitement suggest the statements were not made in anticipation of their use at trial, but were more akin to unfiltered speech. Additionally, as the Supreme Court described in *Stahl*, statements directed toward medical personnel for a medical purpose remain nontestimonial, even if law enforcement is present or the information is eventually used to prosecute the state's case.

**{¶ 34}** This is true for both of Augst's challenged soliloquys. The first challenged soliloquy began after the paramedic, gesturing at Augst's head wound, said, "let's see what happened." Augst tilted his head and explained that he was pistol-whipped. The paramedic asked if he got knocked out during the altercation and Augst launched into his story in response, some of which provided information relevant to his medical treatment ("They hit

me with the gun") and some of which was not ("They took me in the door"). (State's Ex. K at 14:19:44 to 14:20:30.) Augst did not speak to a police officer, he exhibited signs of agitation and excitement, and he explained the cause and source of his injuries to the individual rendering medical aid. Because the testimonial nature of a statement turns on the expectation of the speaker, these factors indicate Augst did not expect for this statement to be used at trial.

{¶ 35} Augst's second soliloquy was a response to a woman off-camera confirming he was choked after Augst declined Lieutenant Shaw's offer to be taken to a hospital.[1] Augst answered, "Yeah, he choked me. He was threatening [undecipherable] that he was going to kill me." (State's Ex. K at 14:21:45 to 14:21:49.) We cannot say that the addition of this sentence rendered the statements testimonial; they were seamlessly incorporated into his answers to medical personnel about his injuries in the immediate aftermath of his own assault and a shooting in his home and do not suggest he reasonably believed they would be available for use at a later trial.

{¶ 36} Therefore, we cannot say the trial court erred in concluding that Augst's statements were nontestimonial and therefore their admission did not violate the Confrontation Clause.

**2. Hearsay**

{¶ 37} Having determined Augst's statements were nontestimonial and therefore the video's admission into evidence did not violate Walker's rights under the Confrontation Clause, we next consider whether his statements were impermissible hearsay and, if so, whether they satisfied one of the hearsay exceptions in Evid.R. 803.

{¶ 38} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Hearsay is inadmissible unless excepted under a specific constitutional, statutory, or legal authority. *See* Evid.R. 802. Because Augst did

---

[1] On cross-examination, Lieutenant Shaw was only asked about the identity of the individual to whom he relayed Augst's statement. (*See* Dec. 9, 2021 Tr. at 458.) Counsel did not ask whether he could identify the off-camera female speaker who asked if Augst was choked. However, Lieutenant Shaw was asked to identify the woman standing behind him in the state's Exhibit K2, a still image taken as the two approached the cruiser with Augst. He affirmatively identified the woman as the training emergency room physician accompanying him that day. (Tr. at 450.) Regardless, Walker does not argue on appeal that the woman speaking at 14:21:42 was law enforcement and thus subject to a different Confrontation Clause analysis.

not testify at Walker's trial and his statements were used at trial to prove the truth of the matter they asserted, the statements contained in the video qualify as hearsay. However, the trial court found they were admissible on several bases.

{¶ 39} During trial, in addition to raising the Confrontation Clause as described above, Walker's counsel objected to admission of the dashcam footage, asserting it was impermissible hearsay and did not satisfy one of the enumerated exceptions in Evid.R. 803. In response, the state asserted, and the trial court agreed, that although the statements were hearsay, they fell under two exceptions—the exception for excited utterances under Evid.R. 803(2) and the exception for statements for purposes of medical diagnosis or treatment under Evid.R. 803(4). We review the trial court's determination for an abuse of discretion. *See, e.g.*, *State v. Sullivan*, 10th Dist. No. 10AP-997, 2011-Ohio-6384, ¶ 56.

### a. Excited Utterance Exception Under Evid.R. 803(2)

{¶ 40} We apply a four-part test to determine whether a statement qualifies as an "excited utterance" under Evid.R. 803(2): (1) there must occur an event startling enough to cause nervous excitement in the declarant; (2) the statement must be made while the declarant was still in a state of excitement caused by the startling event; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 33; *accord Taylor*, 66 Ohio St.3d 295 (1993). With respect to the second prong, the Supreme Court has explained that "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought." (Emphasis sic.) *Taylor* at 303. When making this determination, a court may also consider "the mental and physical condition of the declarant, the nature of the statement, and the influence of any intervening circumstances." *Hughes* at ¶ 33.

{¶ 41} Walker does not contest that the challenged statements in the video satisfy the first and fourth prongs of the excited utterance test, because Augst personally observed and was harmed during the assault and shootings—events that would tend to induce a nervous excitement in any person. (Appellant's Brief at 35.) *See also C.G.*, 2021-Ohio-71 at ¶ 33, quoting *State v. Mauldin*, 7th Dist. No. 08-MA-92, 2010-Ohio-4192, ¶ 73 (" 'An

assault is a startling event.' "). Instead, Walker challenges whether Augst was still in such a nervous or excited state by the time he made the recorded statements, and whether the statements related to the startling occurrence. (Appellant's Brief at 35-36.)

{¶ 42} Officer Daniel Yandrich testified at trial that he received a dispatch about a shooting at 2:07 P.M. on July 24, 2020, and it took him approximately three minutes to drive to the scene. (Tr. at 503-04.) He was the first to arrive and had his gun drawn when he exited the cruiser. (Tr. at 505.) Once there, Officer Yandrich saw two individuals in the front yard, one of whom (Augst) was bleeding from a head wound. (*Id.*) He testified that other officers began arriving within minutes and the individuals from the front yard were secured in separate cruisers while officers completed a sweep of the scene. (Tr. at 508.) At some point after Lieutenant Shaw arrived on scene, he began his assessment of Augst. (Tr. at 448.) He testified that his initial observation was of Augst locked inside a police cruiser, "banging on the window," "agitated," and bleeding from the wound on his head. (Tr. at 457.) These observations were corroborated by the dashcam footage. The video began recording at 2:18 P.M. and ran approximately 3 minutes and 47 seconds. (State's Ex. K.) At the beginning of the footage, Augst was undeniably in a heightened state, pounding frantically on the window, and yelling about his dizziness, his head wound, and the heat inside the car. (State's Ex. K at 14:18:46 to 14:19:00.) He then shouted, "I just got the fuck pistol-whipped out of me. I'm sitting in a hot ass car, bro." (State's Ex. K at 14:19:08 to 14:19:11.)

{¶ 43} On appeal, Walker challenges the trial court's determination as to two specific statements Augst made during Lieutenant Shaw's examination. He argues there was a point during the discussion with Lieutenant Shaw when Augst transitioned from a reactive to a reflective state and was therefore no longer acting under the stress of the event. (Appellant's Brief at 35.) Specifically, Walker asserts that the moment Augst was informed by someone off-camera that "we're trying to save your dude's life there, bud," he "immediately calm[ed] himself" and focused his attention on addressing this new matter. (Appellant's Brief at 35, citing State's Ex. K at 14:19:15.)

{¶ 44} Although Augst's demeanor shifted at that moment from panicky anger displayed at the start of the video, we cannot say that his "nervous excitement" caused him "to lose a domination over his reflective faculties." *Taylor* at 301. Augst began breathing

rapidly, repeatedly demanded to know who was shot, and appeared to be in a state of shock after learning someone—possibly one of his friends—was critically injured during the encounter. (*See, e.g.*, State's Ex. K at 14:19:15 to 14:19:30.)  The shallow breathing, the stiff, tense body language, and the intensity in his tone of voice continued until the end of the recording.

{¶ 45}  From Peterman's testimony, the timestamp on Exhibit K, and the emergency dispatch received by Officer Yandrich at 2:07 P.M., we can say with reasonable certainty that the "startling event" and the recorded statements took place within a short period of time, likely between 20 to 30 minutes in total.  However, the amount of time between events, by itself, is not dispositive of someone's state of mind for purposes of Evid.R. 803(2).  As noted above, we may also consider the mental and physical condition of the declarant, the nature of the statement, and the influence of any intervening circumstances.  *Hughes*, 2015-Ohio-151 at ¶ 33.  Augst was almost immediately detained in a police cruiser once officers arrived on the scene.  The recording began with Augst frantically pounding on a window and yelling inside of the locked car.  Moreover, he had significant injuries, including a bleeding head wound, coupled with the midday heat on a July day in a car with the windows rolled up.

{¶ 46} We cannot say these conditions were an intervening occurrence such that Augst was no longer acting under the influence of the nervous excitement caused by his own assault and the shooting in his home.  Instead, these conditions exacerbated the panic, stress, and excitement he experienced following the incident.  And, halfway through the dashcam recording, instead of gaining his composure once he managed to get some relief from the heat and speak to a paramedic, he was informed that someone was bleeding out on his living room floor.  It appears he was momentarily stunned into silence, and then expressed concern that the victim could be one of his friends.  Our review of the footage does not reveal a period of time when Augst clearly collected himself and regained his reflective faculties.  *See C.G.* at ¶ 36 ("We also cannot find that S.S.'s ability to communicate the details of the assault proved that her statements were the product of reflective thought.").  It therefore appears that his state of nervous excitement after the shooting was sustained—not interrupted—by the subsequent events.

{¶ 47} For the foregoing reasons, the trial court did not abuse its discretion in concluding that Augst's statements fall under Evid.R. 803(2)'s excited utterance exception.

{¶ 48} Because we conclude the video falls under the hearsay exception for excited utterances, we need not address whether the statements satisfy Evid.R. 803(4)'s exception for statements made for medical diagnosis or treatment.  Accordingly, Walker's first assignment of error is overruled.

### B.  Second Assignment of Error

{¶ 49} In his second assignment of error, Walker argues the evidence is legally insufficient to support his conviction for kidnapping. For the following reasons, we disagree.

{¶ 50} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict."  *Cassell*, 2010-Ohio-1881 at ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt." *State v. Sherman*, 10th Dist. No. 20AP-541, 2021-Ohio-4532, ¶ 28.  "In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Cassell* at ¶ 37.  Accordingly, we do not engage in a credibility determination or resolve evidentiary conflicts, but instead consider whether the state presented sufficient evidence as to each element of the crime. *State v. Ferguson*, 10th Dist. No. 20AP-437, 2022-Ohio-1648, ¶ 49.  As a question of law, a challenge to the sufficiency of the evidence is reviewed de novo.  *Sherman* at ¶ 28.

{¶ 51} On appeal, Walker challenges only the sufficiency of his kidnapping conviction. R.C. 2905.01 states, in relevant part:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;

> (3) To terrorize, or to inflict serious physical harm on the victim or another[.]

{¶ 52} Both parties concede that Walker's kidnapping conviction was reached under a theory of complicity; specifically, with Walker aiding or abetting Stanton in the commission of kidnapping.[2] (*See* Appellee's Brief at 30; Appellant's Brief at 40; Dec. 10, 2021 Tr. at 622, 683.) R.C. 2923.03(A)(2) codifies the common law principle of accomplice liability. Under the statute, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense."

{¶ 53} To be convicted as an aider or abettor, the accused must have "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and * * * shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001). Therefore, in order to prove complicity to kidnapping, the state had to produce evidence that Walker, acting with the requisite criminal intent, aided and abetted Stanton in the commission of kidnapping.

{¶ 54} The parties do not dispute that Stanton, not Walker, was the individual who restrained Augst. The state asserted at trial that Stanton "barging into someone's home, putting them in a headlock, and pistol whipping them" constituted kidnapping under R.C. 2905.01(A) because he restricted Augst's movements involuntarily in order to inflict harm. (Tr. at 638.) On appeal, Walker challenges the lack of sufficient evidence to support the kidnapping conviction in two respects: (1) insufficient evidence to prove that Stanton committed the underlying offense of kidnapping; and (2) insufficient evidence that Walker acted with the requisite culpability. (*See* Appellant's Brief at 42.)[3]

{¶ 55} Whether Stanton committed or attempted to commit the underlying offense is a threshold issue to determining whether Walker was complicit in kidnapping. *See* R.C. 2923.03(C). In closing argument, the state asserted that Stanton, by force, both "removed" Augst from where he was found and "restrained" Augst by pushing him from the doorway to the living room and placing him in a headlock. (Tr. at 639-40.) This force, the

---

[2] "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

[3] Because Walker does not challenge the second component of the complicity statute, our analysis here is confined to whether Walker acted "with the kind of culpability required for the commission of an offense." R.C. 2923.03(A).

state asserted at trial and now asserts on appeal, was used to either facilitate felonious assault, or aggravated burglary, or to terrorize or inflict serious physical harm on Augst. Walker disputes that Stanton used force to fulfill either purpose, and instead asserts Augst's restraint or removal *resulted from* the commission of a felony or the infliction of terror or serious physical harm.  (Appellant's Reply Brief at 9.)

{¶ 56} Through the video of Augst's statements in the police cruiser and Peterman's trial testimony, the state presented evidence that Stanton made his way inside the house, placed Augst in a headlock with his left arm, then used the firearm in his right hand to strike Augst.  (State's Ex. K; Dec. 8, 2021 Tr. at 355, 367.)  In light of this record and construing the evidence in the light most favorable to the prosecution, as we are required to do for a sufficiency challenge, we conclude that the state produced sufficient evidence to prove each element of kidnapping with respect to Stanton.

{¶ 57} We next consider whether the state presented sufficient evidence to establish that Walker acted with the requisite culpability to support his kidnapping conviction. Walker does not challenge whether he aided or abetted Stanton and we have already concluded that Stanton inflicted serious physical harm on Augst.  Thus, our review is limited to whether there was sufficient evidence to support the jury's determination of Walker's intent at the time of the kidnapping.

{¶ 58} To satisfy the intent element of the offense, the state had to present sufficient evidence that Walker aided and abetted Stanton with the ***purpose*** to facilitate the commission of a felony or flight thereafter, to terrorize, or to inflict serious physical harm on Augst.  *See* R.C. 2905.01(A)(2) through (3).  *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 188 ("Jurors need not agree on a single means for committing an offense."). A person acts with purpose when "it is the person's specific intention to cause a certain result."  R.C. 2901.22(A).  Therefore, the state must have presented sufficient evidence to prove that at the time of Augst's restraint or removal, Walker shared Stanton's purpose to either (1) facilitate a felony or (2) terrorize or inflict serious physical harm.  Purpose or intent "may be inferred from the circumstances surrounding the crime, including presence, companionship, and conduct before and after the offense is committed."  *State v. Thompson*, 10th Dist. No. 10AP-593, 2011-Ohio-6725, ¶ 10, citing *State v. Kendricks*, 10th

Dist. No. 10AP-114, 2010-Ohio-6041, ¶ 15. *See also State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 36.

{¶ 59} At trial, the state introduced evidence from before, during, and after the incident to establish Walker's mental state.

{¶ 60} With respect to his knowledge of Stanton's plan prior to the incident, the state presented testimony from Howell and Gilcrease. The day before, Howell saw Stanton return to their apartment with a backpack containing drugs and a gun that she had never seen before. She testified that she later overheard Stanton and Walker arguing over the phone about how they would split the contents of the backpack. (Dec. 7, 2021 Tr. at 141.) Howell testified that she and Walker spoke after the incident. Walker told her Stanton went to Augst's house intending to "check somebody" after a visit to his mother's house. (Tr. at 142.) Walker told Howell he tried to stop Stanton, but noted that his friend "did some dumb shit." (Tr. at 143.) Gilcrease also testified at trial about her own conversations with Walker following the incident. She recounted a phone call from Walker explaining that Stanton went to Augst's house wanting to rob someone there, and, in the course of events, Stanton was shot. (Tr. at 155.) Like Howell, Gilcrease testified that Walker was initially reluctant to go but believed Stanton "was going to die" during the confrontation. (*Id.*)

{¶ 61} The jury also heard testimony about what happened once Stanton and Walker arrived at Augst's home. Peterman testified that a man he later learned was Stanton knocked on the door of Augst's home that afternoon and accused Augst of going to his mother's house. (Dec. 8, 2021 Tr. at 389.) Eventually, hearing a "commotion," Peterman checked on Augst and saw Stanton and Augst "tussling" in the living room, having moved inside the house at some point during the argument. (Tr. at 390.) Peterman testified that Augst and Stanton were the only individuals he saw in the living room at that time. (Tr. at 360.) It is therefore impossible to say with certainty where Walker was at the exact moment of the restraint. However, Augst's recorded statements from inside the police cruiser used "they" periodically while recounting his assault. For example, at one point, he stated, "***They*** took me in the door."[4] (Emphasis added.) (State's Ex. K at 14:19:54.) Augst's

---

[4] In the dashcam video of his statement, Augst used both "they" and "he" interchangeably. For example, he stated, "***They*** hit me with the gun. * * * And *they* kept choking me out[.] * * * And *he* pistol-whipped me again." (Emphasis added.) (State's Ex. K at 14:19:54 to 14:20:20.) When viewed in the light most favorable

neighbor Williams also testified at trial and stated that she saw Walker running from Augst's front yard carrying a gun. (Tr. at 210.)

{¶ 62} From the testimony of Howell and Gilcrease, the state produced evidence that a backpack with drugs and a gun was stolen from someone associated with Augst, Walker and Stanton argued about how to divide the contents of the backpack between the two of them, Stanton took offense with Augst's visit to his mother's house, and Walker, knowing his friend planned to rob Augst and could die during this confrontation, accompanied him into a fraught situation armed with a gun.

{¶ 63} The jury had sufficient evidence to conclude from Walker's conduct that he shared a common purpose with Stanton on the day of the incident. Knowing Stanton was angered to the point he could not be dissuaded, Walker willingly took a gun and got in the car with his friend. From this evidence, the jury was able to infer that Walker acted with the purpose to harm Augst, either by terrorizing or inflicting serious physical harm, or to commit a felony offense inside Augst's home once they arrived.

{¶ 64} Construed in the light most favorable to the prosecution, the evidence was sufficient to allow a reasonable jury to conclude Walker was complicit in kidnapping. Accordingly, Walker's second assignment of error is overruled.

## C. Third Assignment of Error

{¶ 65} In his third assignment of error, Walker contends that his robbery convictions associated with the handgun thefts should be vacated for two reasons: (1) because grand theft when the property stolen is a firearm or dangerous ordnance under R.C. 2913.02(B)(4), as a more specific offense than robbery under R.C. 2911.02(A)(1) and (B), must prevail pursuant to R.C. 1.51, *see State v. Chippendale*, 52 Ohio St.3d 118 (1990); and (2) because robbery involving a deadly weapon does not include an offense where the only deadly weapon at issue is the object of the theft. We review questions of statutory construction de novo. *State v. Armstrong*, 10th Dist. No. 16AP-410, 2017-Ohio-8715, ¶ 14.

{¶ 66} As to the first of his arguments, Walker concedes the Supreme Court has already conclusively addressed this issue in *State v. Campbell*, 90 Ohio St.3d 320, 331-32 (2000). Accordingly, we overrule this portion of his third assignment of error.

---

to the state, these statements suggest Walker may have been involved or at least present inside the house when the kidnapping occurred. *See Cassell* at ¶ 37.

{¶ 67} As to the second part of his assignment of error, R.C. 1.51 states that "[i]f a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both.  If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." "R.C. 1.51 comes into play only when a general and a special provision constitute allied offenses of similar import and additionally do not constitute crimes committed separately or with a separate animus for each crime." *Chippendale* at 120.  Convicting someone of robbery requires a finding that the defendant, "in attempting or committing a theft offense or in fleeing immediately after the attempt or offense," acted in a manner prohibited by R.C. 2911.02 in addition to the theft offense.  Thus, the commission of a robbery will necessarily result in the commission of a theft.  R.C. 1.51 does not require a special or local provision to prevail unless the conflict between the provisions is "irreconcilable." *See Armstrong* at ¶ 25.  Here, the conduct proscribed by the theft and robbery statutes are similar but not irreconcilable.  By definition, the offense of robbery requires additional conduct above and beyond the elements needed to satisfy a theft conviction.  Thus, the two statutes do not conflict.

{¶ 68} Additionally, the conduct underlaying both offenses did not occur in the same instance.  The crime of grand theft was completed when Walker obtained possession of the firearm beyond the scope of the seller's consent.  The elements of robbery, however, were not met until Walker, fleeing immediately after committing the offense, had a deadly weapon on his person and under his control.

{¶ 69} For the above reasons, Walker's third assignment of error is overruled.

**D. Fourth Assignment of Error**

{¶ 70} In his fourth assignment of error, Walker contests the sufficiency of evidence for the firearm specifications associated with the handgun thefts, arguing that he only possessed the firearm after committing the offense to which the specification attached.  However, as Walker concedes, this issue has already been decided by the Supreme Court in *Campbell*.  (Appellant's Reply Brief at 13.)  Accordingly, Walker's fourth assignment of error is overruled.

## III.  Conclusion

{¶ 71} Having overruled Walker's first, second, third, and fourth assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

LUPER SCHUSTER and MENTEL, JJ., concur.

_____